NOS. 21-14071 & 21-14074

# United States Court of Appeals
## For The Eleventh Circuit

**COMPULIFE SOFTWARE, INC.,**
*Plaintiff – Appellee – Cross Appellant*

*v.*

**BINYOMIN RUTSTEIN, A.K.A. BEN RUTSTEIN,
JOHN DOES 1-10, DAVID RUTSTEIN.**
*Defendant – Appellant – Cross Appellee*

**COMPULIFE SOFTWARE, INC.,**
*Plaintiff – Appellee – Cross Appellant*

*v.*

**MOSES NEWMAN, AARON LEVY, DAVID RUTSTEIN, A.K.A. DAVID
ANTHONY GORDON, A.K.A. BOB GORDON, A.KA. NATE GOLDEN,
BINYOMIN RUTSTEIN, A.K.A. BEN RUTSTEIN**
*Defendants – Appellants – Cross Appellees*

## BRIEF OF APPELLANT BINYOMIN RUTSTEIN

Michael Diaz
Marta Colomar Garcia
Zhen Pan
Diaz, Reus & Targ, LLP
100 S.E. 2nd Street, Suite 3400 Miami,
Florida 33131
(305) 375-9220
*Counsel for Appellant Binyomin Rutstein*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Defendant/Appellant – Cross Appellee Binyomin Rutstein hereby discloses the following, in alphabetical order, trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party in this matter.

1. Allison L. Friedman, P.A. (Trial counsel for Binyomin Rutstein, David Rutstein, Aaron Levy, and Moses Newman)

2. Barney, Robert (Representative of Compulife Software, Inc.)

3. Colomar Garcia, Marta (Appellate counsel for Binyomin Rutstein)

4. Compulife Software, Inc. (Plaintiff)

5. Diaz, Michael Jr. (Appellate counsel for Binyomin Rutstein)

6. Diaz, Reus & Targ, LLP (Appellate counsel for Binyomin Rutstein)

7. Friedman, Allison L. (Trial counsel for Binyomin Rutstein, David Rutstein, Aaron Levy, and Moses Newman)

8. Gulisano Law, PLLC (Appellate counsel for David Rutstein, Aaron Levy, and Moses Newman)

9. Gulisano, Michael (Appellate counsel for David Rutstein, Aaron Levy, and Moses Newman)

10.    Levy, Aaron (Defendant)

11.    Newman, Moses N. (Defendant)

12.    Pan, Zhen (Appellate counsel for Binyomin Rutstein)

13.    Reinhart, Bruce E. (S.D. Fla.)

14.    Rosenberg, Robin L. (S.D. Fla.)

15.    Rothman, Joel B. (Counsel for Compulife Software, Inc.)

16.    Rutstein, Binyomin (Defendant)

17.    Rutstein, David Brian (Defendant)

18.    SRIPlaw, PLLC (Counsel for Plaintiff)

## STATEMENT REGARDING ORAL ARGUMENT

Counsel for Binyomin Rutstein are willing to present their arguments to the extent that this Court believes that it would be helpful to decide the issues on appeal.

## **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ...................................................................... C-1of 2

STATEMENT REGARDING ORAL ARGUMENT ................................................ i

TABLE OF AUTHORITIES ...................................................................... iv

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ......................................1

STATEMENT OF THE CASE...............................................................2

  I.  Parties ...............................................................................2

    A.  Plaintiff/Appellee Compulife Software, Inc. ("Compulife").......................2

    B.  Defendants/Appellants David Rutstein, Moses Newman, and Aaron Levy.4

    C.  Defendant/Appellant Binyomin Rutstein.......................................5

  II.  David's Operations of BeyondQuotes and Naaip ...........................6

  III.  BeyondQuotes' And NAAIP's Access to Compulife's Copyrighted Source Code and Web Quoter................................................................8

  IV.  Compulife's Investigation of David, BeyondQuotes, and NAAIP ................9

  V.  The Scraping Incident..........................................................11

  VI.  Procedural History ............................................................12

    A.  Compulife's claims against Defendants and the first bench trial.............12

    B.  The first appeal before this Court ...........................................13

    C.  The second bench trial .......................................................15

SUMMARY OF THE ARGUMENT ..................................................................18

ARGUMENT .............................................................................................................19

    I.    Standard Of Review.........................................................................19

    II.    Scraping Publicly Available Information from a Website That Imposed No Restriction to Access Does Not Constitute Acquisition by Improper Means. ......20

    III.    The District Court Erred in Finding Personal Liability against Binyomin Based on His Conduct as the Owner of AWD and His Permission to Allow David to Use His Insurance License in Connection with AWD. ....................................28

    IV.    The District Court's Findings Lack the Specificity Required to Hold Binyomin Jointly and Severally Liable for Other Defendant's Conduct. ............32

CONCLUSION ........................................................................................................35

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Brocade Communications Sys., Inc. v. A10 Networks, Inc.*,
    873 F. Supp. 2d 1192 (N.D. Cal. 2012)................................................................33

*Compulife Software Inc. v. Newman, et al.*,
    959 F.3d 1288 (11th Cir. 2020) .................................................................. *passim*

*Compulife Software, Inc. v. Binyomin Rutstein*, *et al*,
    Case No. 16-CV-80808-ROSENBERG ECF 314 (S.D. Fla. July 12, 2021)
    (District Court's Findings of Fact and Conclusions of Law) ...................... *passim*

*Cvent, Inc. v. Eventbrite, Inc.*,
    739 F. Supp. 2d 927 (E.D. Va. 2010) .......................................................... *passim*

*Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*,
    148 F. Supp. 2d 1326 (S.D. Fla. 2001) …………………………………………33

*E. I. duPont deNemours & Co. v. Christopher*,
    431 F.2d 1012 (5th Cir. 1970) ............................................................................26

*Fishkin v. Susquehanna Partners, G.P.*,
    CIV.A.03-3766, 2007 WL 853769 (E.D. Pa. Mar. 19, 2007) .............................33

*Florida Beauty Flora Inc. v. Pro Intermodal L.L.C.*,
    20-20966-CIV, 2021 WL 1945821 (S.D. Fla. May 14, 2021). ...........................30

*Jacksonville Elec. Auth. v. Bernuth Corp.*,
    996 F.2d 1107 (11th Cir. 1993) ..........................................................................29

*Physicians Interactive v. Lathian Sys., Inc.*,
    No. CA 03-1193-A, 2003 WL 23018270 (E.D. Va. Dec. 5, 2003).............. *passim*

*Smith v. Mama Fu's Hollywood, LLC*,
    08-61181-CIV, 2009 WL 10667069 (S.D. Fla. July 8, 2009)..............................29

*Weekley v. Howard*,
  210 So. 2d 453 (Fla. 1st DCA 1968) ....................................................................29


**Statutes**

18 U.S.C. § 1836 ............................................................................................32

18 U.S.C. § 1839(5) .......................................................................................31

18 U.S.C. § 1839(6) .......................................................................................27

28 U.S.C. §1291 ...............................................................................................1

FLA. STAT. § 688.002(2)(a) ..........................................................................20

FLA. STAT. § 688.002(2)(b) ..........................................................................21

FLA. STAT. § 688.004 ....................................................................................32

FLA. STAT. § 768.81(4) ................................................................................32

## JURISDICTIONAL STATEMENT

Defendant/Appellant – Cross Appellee Binyomin Rutstein ("Binyomin") appeals the district court's Entry of Final Judgment and Permanent Injunction [ECF 317][1] (the "Final Judgment") against him in *Compulife Software, Inc. v. Binyomin Rutstein*, *et al*, Case Nos. 16-CV-80808-ROSENBERG (the "08 Case") and 16-CV-81942-ROSENBERG (the "42 Case"), which have been consolidated for trial and post-trial proceedings before the United States District Court for the Southern District of Florida.  Binyomin timely filed a notice of appeal in each case on November 18, 2021.  ECF 325, 326.  This Court has jurisdiction pursuant to 28 U.S.C. §1291.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Whether the district court erred in holding that scraping publicly available information from a website, which does not impose any access restriction to the general public, constitutes acquisition of trade secrets by "improper means"

---

[1]      Consistent with the district court's Findings of Fact and Conclusions of Law, all citations in this brief are to the electronic case files ("ECF") in the 08 Case.  In addition, citations in the form "FFCL ¶ __" or "FFCL p. __" are to the Findings of Fact and Conclusions of Law filed at ECF 314, followed either by the underlying testimony at the bench trial between November 16 and November 20, 2021 (filed at ECF 308 through 313) or by the exhibits used at trial.  Citations in the form "SUF ¶ __" or "SUF p. __" are to the parties' Statement of Uncontested Facts for Trial ("SUF") filed at ECF 286-1.  Unless otherwise indicated, in quotations throughout this brief, all emphases are added and all internal quotations and citations are omitted.

1

under the Federal Defend Trade Secrets Act ("DTSA") and the Florida Uniform Trade Secrets Act ("FUTSA").

2.    Whether the district court erred in finding Binyomin personally liable to Compulife for misappropriation of trade secrets based on his conduct as the owner of American Web Designers, Ltd. ("AWD") and his permission to allow David Rutstein to use his insurance license in connection with AWD.

3.    Whether the district court erred in imposing joint and several liability against Binyomin for other Defendants' conduct, without comparing the degree of Binyomin's wrong with the degree of wrong committed by other Defendants.

## STATEMENT OF THE CASE

### I.    Parties

#### A.    Plaintiff/Appellee Compulife Software, Inc. ("Compulife")

Compulife engages in the business of generating life insurance quotes on the internet and licensing its software for use by life insurance agents to perform life insurance policy comparisons.  SUF ¶¶ 1, 3.  Compulife's internet-quote engine, which is hosted on its server, contains a database of term life products, term life rates, and associated data created by Compulife (the "Transformative Database").  SUF ¶ 6; FFCL p. 2 n. 3; ECF 309 p. 122:18-22.  Insurance agents buy access to the

Transformative Database so that they can provide insurance premium quotes[2] to prospective policy purchasers.  FFCL p. 2 n. 3.

There are two types of Compulife software: a "PC version" and an "Internet Engine version."  SUF ¶ 2.  Each version includes the Transformative Database. SUF ¶ 6.  Licensees of the PC version use the local copy of the Transformative Database to generate insurance-rate estimates.  SUF ¶ 2.  PC licensees can also purchase an add-on called the "web quoter," which allows them to place the quoter on their own websites to communicate with Compulife's internet-quote engine so as to access the Transformative Database to obtain insurance premium quotes.  FFCL p. 1, n. 2; ECF 308 p. 54:1-7; ECF 309 pp. 32:4-33.  On the other hand, the "Internet Engine" version permits a licensee to host Compulife's internet-quote engine, which includes the Transformative Database, on the licensee's own server and to provide insurance quotes directly to web visitors.  SUF ¶ 2.

---

[2]    There is a difference between the terms "insurance (premium) quotes" and "insurance rates."  Insurance rates are one of the raw materials used in developing an insurance premium for a policy.  Insurance rates are never given to a consumer. Instead, rates are used to calculate insurance premium quotes given to consumers to tell them how much the insurance will cost.  FFCL ¶10; ECF 308 p. 45:25-46:9. Insurance rates are typically public information.  FFCL ¶11; ECF 308 p. 42:8-10. Robert Barney, the founder and president of Compulife, takes the information from approximately 100 insurance companies' (out of over 1,000 insurance companies in the U.S.) rate books and rate charts and inputs said information into the Transformative Database.  FFCL ¶ 13; ECF 308 p. 44:12-18; ECF 309 p. 5:1-6.

3

Compulife also operates Term4Sale.com, a public website, where visitors can type in basic information about themselves to generate life insurance quotes. SUF ¶¶ 5, 53. Along with the quotes, Term4Sale.com provides visitors with referrals to insurance agents who pay Compulife for this service in a fashion similar to Yellow Pages listings. SUF ¶ 5.

## B. Defendants/Appellants David Rutstein, Moses Newman, and Aaron Levy

David Rutstein ("David") was a Florida licensed insurance agent before April 19, 2012. FFCL ¶ 23; ECF 311 p. 128:13-14. In 2010, David founded the National Association of Accredited Insurance Professionals ("NAAIP") on the internet. SUF ¶ 46. NAAIP is only a website, not an organization of any kind. SUF ¶ 28. David purchased the NAAIP.org domain name and used it in conducting insurance business. SUF ¶¶ 29, 46; FFCL ¶ 46. The business of NAAIP is creating "free" websites for life insurance agents. SUF ¶ 22. A key benefit offered by a "free" NAAIP website is access to NAAIP's "Life Insurance Quote Engine." SUF ¶ 23.

Defendant Moses Newman ("Newman"), who began programming for NAAIP in April of 2016, developed the NAAIP Life Insurance Quote Engine. SUF ¶ 57; FFCL ¶ 51; ECF 311 pp. 109:19-110:6. The "Life Insurance Quote Engine" allows internet visitors to a free NAAIP website to enter certain basic information about their age, insurance rating and type of policy, as well as name telephone number and email address, and the NAAIP "Life Insurance Quote Engine" will

4

provide a list of quotes for term life insurance policies that are available. SUF ¶ 24. In 2016, the ownership of NAAIP.org was transferred to Defendant Aaron Levy ("Levy"). FFCL ¶ 24; ECF 308 p. 145:1-2.

David also founded BeyondQuotes and owned the website BeyondQuotes.com since 2011. SUF ¶ 29; ECF 311 179:17-19. The BeyondQuotes website also operates a "Life Insurance Quote Engine" that allows internet visitors to enter certain basic personal information and obtain a list of quotes for term life insurance policies with no charge. SUF ¶ 25. If a visitor wishes to purchase a policy, that visitor becomes a "lead" that BeyondQuotes sells to insurance agents. SUF ¶ 26. NAAIP's free websites and BeyondQuotes provide the same services as those offered by Compulife and its Term4Sale website. SUF ¶ 35.

### C.    Defendant/Appellant Binyomin Rutstein

Binyomin, David's son, is an insurance agent licensed in multiple states. SUF ¶¶ 32, 33. Binyomin never had any involvement with NAAIP. FFCL ¶ 24; SUF ¶¶ 45, 58; ECF 311 p. 194:3-5. Binyomin had no involvement with BeyondQuotes after 2009; before that, he did digital marketing for BeyondQuotes.com. ECF 304-31 pp. 119:1-120:5. At trial, Robert Barney ("Barney"), Compulife's president, testified that he never dealt with Binyomin concerning either NAAIP or BeyondQuotes. ECF 309 p. 87:1-25.

## II.    David's Operations of BeyondQuotes and Naaip

MBM Life Quotes, Inc. ("MBM"), a life insurance agency, was a licensee of Compulife.  FFCL ¶ 31; ECF 310 p. 72:16-73:3.  To increase MBM's performance, in or around August of 2011, Brian McSweeney ("McSweeney"), the principal and insurance agent for MBM, explored opportunities to work with David, as BeyondQuotes.com was the number one site on Google that generated the most leads for the sale of life insurance policies.  ECF 304-34 pp. 176:25-177:2.

On August 15, 2011, David used AWD, a company originally opened by Binyomin and initially intended to engage in web design business, to enter into a written agreement with MBM.  ECF 311 p. 177:14-23.  Under the agreement, for every lead received from BeyondQuotes.com that resulted in the sale of an insurance policy for MBM, McSweeney would pay a "lead generation fee" to AWD.  FFCL ¶ 31; ECF 311 pp. 180:4-181:13.

David opened AWD's bank account by presenting his passport with his photograph as identification, became an authorized signor on that account, and operated the company as a licensed insurance agency at the material time.  FFCL ¶ 30; ECF 311 pp. 137:14-138:25.  MBM paid AWD $75,819.00 for the leads received through BeyondQuotes.com from September of 2011 through December of 2012.  ECF 304-34 pp. 198:3-199:8; 218:6-10; SUF ¶ 36; FFCL ¶ 32.

6

At the same time that MBM contracted with AWD, MBM was a customer of MSCC Corporation ("MSCC"). ECF 304-34 p. 175:19-176:4. MSCC, owned by Michael Steinhardt ("Steinhardt"), sells customer relation management service for insurance agents to record information on consumers who buy life insurance. SUF ¶¶ 37, 39; ECF 304-33 p. 7:3-5. At the relevant time, MSCC, an Internet Engine licensee of Compulife, made Compulife's software available to MSCC's customers. SUF ¶ 38; FFCL ¶ 33; ECF 304-33 pp. 9:14-21, 10:19-25.

Thereafter, on April 19, 2012, the Florida Department of Financial Services revoked David's insurance license in the *Matter of David Brian Rutstein*, Case No. 115256-11-AG. SUF ¶ 59. The consent decree bans David from any involvement, participation or affiliation with anyone in the business or transaction of insurance. SUF ¶¶ 30, 59. David obtained Binyomin's permission to use Binyomin's insurance license in connection with AWD. FFCL ¶ 30; ECF 311 p. 194:10-14.

In 2014, AWD and One Resource Group ("ORG"), a life insurance wholesaler, entered into an agreement whereby AWD would receive a referral fee for anyone who used ORG's insurance brokerage services through its link on NAAIP.org. FFCL ¶ 37; ECF 304-7. Since then, ORG paid AWD $108,406.87 in commissions from sales of insurance policies by NAAIP.org members. FFCL ¶ 37; ECF 308 p. 148:1-12; ECF 311 p. 191:3-12.

**III.    BeyondQuotes' And NAAIP's Access to Compulife's Copyrighted Source Code and Web Quoter**

On August 17, 2011, David sent an email to McSweeney and Compulife (service@compulife.com) requesting assistance from Compulife to put a quote engine on BeyondQuotes.com. The subject line stated "Dear Compulife – I have an account with you through Eric Savage"[3] and the email stated in part: "I also work with Brian McSweeney of www.mbmlifequotes.com." FFCL ¶ 34 n. 15; ECF 311 p. 181:17-20. Jeremiah Kuhn ("Kuhn"), who has been in charge of customer and technical support for Compulife, believed that David was a website designer for Savage and McSweeney and that BeyondQuotes.com was owned by Savage or McSweeney. FFCL ¶ 34 n. 15; ECF 310 pp. 75:14-25, 76:13-16, 79:7-13. Kuhn provided the Compulife HTML copyrighted source code to David. FFCL ¶ 34 n. 15; ECF 310 pp. 81:7-11, 106:24-107:6. Had Kuhn known that BeyondQuotes did not belong to Savage or McSweeney and that David intended to use the source code on BeyondQuotes.com without paying a licensing fee, Kuhn would have never provided the source code to David. FFCL ¶ 34 n. 15; ECF 310 p. 107:23-108:7.

Soon thereafter, David, through McSweeney, instructed MSCC to put a Compulife web quoter (connected to MSCC's server) on BeyondQuotes.com. FFCL ¶ 34; ECF 311 pp. 184:3-185:9. Steinhardt believed that BeyondQuotes.com was

---

[3]    Eric Savage was a Compulife licensee at that time.

8

owned by McSweeney, but he never verified that.[4]  FFCL ¶ 34; ECF 304-33 p. 37:8-13.  MSCC then provided Compulife's HTML source code for the web quoter to be used on BeyondQuotes.com.  FFCL ¶ 35; ECF 304-33 pp. 13:4-14, 48:12-49:6. David also had a conversation with Steinhardt about incorporating the Compulife web quoter on NAAIP.org.  ECF 311 pp. 187:6-11, 188:22-189:2.

**IV.    Compulife's Investigation of David, BeyondQuotes, and NAAIP**

In April of 2015, it came to Barney's attention that the NAAIP.org website had access to the Transformative Database and used it to generate insurance quotes. FFCL ¶ 38; ECF pp. 308 58:21-23, 64:9-14, 66: 21-23.  Barney discovered that David was doing business on behalf of NAAIP under the alias "David Gordon." FFCL ¶ 39; ECF 308 pp. 121:21-122:3.  Barney notified NAAIP that it was using Compulife's software without permission and demanded that NAAIP stop doing so. FFCL ¶ 40.

Barney's further investigation revealed that BeyondQuotes.com was connected to Compulife's customer McSweeney.  FFCL ¶ 42; ECF 308 p. 77:6-22. Steinhardt (of MSCC) also recognized that the account being used to produce the

---

[4]    Before MSCC's customers could use Compulife's software on MSCC's website, MSCC should verify whether the customer was a subscriber of Compulife's PC service.  FFCL ¶ 33; ECF 304-33 pp. 9:22-10:17.  A Compulife licensee can only put Compulife's web quoter on their own website; putting it on a website they do not own would be in breach of the license agreement.  FFCL ¶ 36; ECF 310 p. 77:4-7.

quotes at NAAIP.org belonged to McSweeney. FFCL ¶ 43; ECF 304-33 pp.19:5-20:13, 21:21-22:13. Steinhardt disabled McSweeney's account's access to the Compulife internet engine software running on MSCC's server, which immediately stopped NAAIP.org websites and BeyondQuotes.com from producing life insurance quotes. FFCL ¶ 43; ECF 304-33 pp.19:5-21:20; ECF 308 p. 106:3-10. On April 13, 2015, David wrote to McSweeney: "the Compulife guy disabled my quote engines . . . which may have been coming from you." FFCL ¶ 44 (alteration in original); ECF 304-34 p. 184:10-18. That same day, David sent an email to Barney threatening to steal Compulife's customers. FFCL ¶ 44; ECF 308 p. 105:3-13. On April 25, 2015, David made similar threats to Compulife's business by email. FFCL ¶ 44; ECF 308 p. 112:13-19.

On June 5, 2015, David used Term4Sale.com to generate hundreds of life insurance quotes; after he was presented with each quote, he sent messages through the Term4Sale website to Compulife's customers stating: "Compulife quote engine: Beware of security flaw. Your back office is not password protected," and provided a hyperlink to NAAIP followed by the statement "term life quote engines are free." FFCL ¶ 45; ECF 308 pp. 131:13, 132:10-133:17. As a result, Compulife did "damage control" with its customers. FFCL ¶ 45; ECF 308 p. 133:18-137:1; Vol. 2, 42:1-11.

10

## V.        The Scraping Incident

Between September 1 and September 4, 2016, a single internet protocol ("IP")
address (which Compulife traced to a server in Israel) sent over 800,000 requests to
Term4Sale.com, extracting insurance quotes from the Transformative Database
hosted on Compulife's server. Each request used the parameters in Compulife's
HTML source code while incrementing the corresponding variables one at a time.
FFCL ¶ 52; ECF 309 pp. 134:1-4, 135:10-24; ECF 310 p. 19:25-20:13; SUF ¶ 60.

Newman, who began programming for NAAIP.org in April 2016, testified
that Matal, an Israeli woman, did so. FFCL ¶ 51; ECF 311 p. 110:3-6; ECF 312
67:22-68:3.16. Matal recorded the returned information in an electronic file, which
Newman then integrated into NAAIP's database that provided life insurance quotes
to users of NAAIP.org websites. FFCL ¶ 51; ECF 311 p. 110:7-18. Newman
acknowledged the information in the file came from Term4Sale.com. FFCL ¶ 51;
ECF 311 p. 114:5-9. Newman was paid for his work by Levy. FFCL ¶ 51; ECF 311
p. 112:20-24; ECF 312 p. 47:9-16.

The quotes that NAAIP produced after scraping matched the quote
information obtainable at the Term4Sale website, except that NAAIP rounded down
to whole dollars. FFCL ¶ 53; ECF 309 p. 172:7-12. Newman testified that
NAAIP.org's database only contained "three million or so" quotes, whereas

Compulife estimated the scraping produced 43.5 million results.  FFCL ¶ 53; ECF 311 pp. 9:12; 117:16-118:8.

Prior to 2016, despite being aware that scraping of Term4Sale.com could happen, Compulife did not add any protections to the Term4Sale site in the event someone wanted to use the quotes generated from the Transformative Database. ECF 309 pp. 177:13-178:3.  Term4Sale.com had no process in place by which to restrict the use of "get" commands to generate insurance premium quotes.  FFCL ¶ 56; ECF 311 p. 93:11-14.  The public was able to visit Term4Sale.com and "pull quotes *without any restriction*."  ECF 310 p. 15:1-5.  In response to the scraping, Compulife modified its internet engine so that, if more than five requests for quotes are made within one second, the software starts slowing down and produces fewer results.  FFCL ¶ 56; ECF 309 pp. 125:23-126:2, 181:1-11.  Compulife also added a terms of use agreement to Term4Sale.com; however, users are not required to read said terms before running an insurance quote.  SUF ¶¶ 43; ECF 309 p. 41:15-21.

## VI.    Procedural History

### A.    Compulife's claims against Defendants and the first bench trial

In the 08 Case, Compulife alleged that Defendants David and Binyomin (1) infringed its copyright in the HTML source code of its web quoter when they implemented similar quoters on their own websites and (2) misappropriated its trade secret by accessing the Transformative Database on MSCC's server to generate

12

quotes without permission.  FFCL p. 2.  In the 42 Case, Compulife alleged that

Defendants David, Binyomin, Newman, and Levy (1) infringed its copyright by

copying parameters and variables from the HTML source code in order to carry out

the scraping attack and (2) misappropriated its trade secret by scraping data from

Term4Sale.com.  FFCL p. 3.  Compulife also asserted false advertising claims under

the Lanham Act, Florida Deceptive and Unfair Trade Practices Act, and Florida

common law in both Cases, as well as a claim for violation of the Florida Computer

Abuse and Data Recovery Act in the 42 Case.  *Compulife Software Inc. v. Newman,*

*et al.*, 959 F.3d 1288, 1300 (11th Cir. 2020).

After a bench trial, the district court entered final judgment in favor of

Defendants on all claims, finding that although Compulife had a valid copyright in

the text of its HTML source code and that its Transformative Database was a

protectable trade secret, Compulife did not meet its burden to prove (i) that the code

allegedly copied by Defendants was "substantially similar" to Compulife's

copyrighted one and (ii) that Defendants misappropriated any trade secrets.  *Id.*  The

district court also rejected the rest of Compulife's claims.  *Id.*

## B.    The first appeal before this Court

Compulife appealed the district court's entire judgment.  This Court found

that the district court committed errors of law as to the copyright and

misappropriation of trade secrets claims and made insufficient findings as to the

copyright claim. *Id.* at 1318. The Court therefore vacated the judgment as to copyright infringement and trade secret misappropriation and remanded for new findings of fact and conclusions of law. *Id.*

In its opinion, this Court made numerous observations characterizing the scraping at issue as "hacking." *See, e.g.*, *id.* at 1295–96 (Defendants "lied and ***hacked*** its way into Compulife's system and stole its proprietary data."); *id.* at 1298 ("defendants also employed a ***hacker*** [who] took Compulife's data for use in the defendants' software"); *id.* at 1299 ("In the 42 case, Compulife alleges that the defendants hired a ***hacker*** [ ] to 'scrape' data from its server. Scraping is a technique for extracting large amounts of data from a website. The concept is simple; a ***hacker*** requests information from a server using ordinary HTTP commands similar to those that a legitimate client program of the server might employ in the ordinary course."); *id.* at 1314–15 ("In the most closely analogous case of which we are aware, a district court held that ***hacking*** a public-facing website with a bot amounted 'improper means.'") (citing *Physicians Interactive v. Lathian Sys., Inc.*, No. CA 03-1193-A, 2003 WL 23018270, at *8 (E.D. Va. Dec. 5, 2003) ("There can be no doubt that the use of a computer software robot to ***hack*** into a computer system and to take or copy proprietary information is an improper means to obtain a trade secret, and thus is misappropriation under the VUTSA.")).

This Court affirmed the judgment in favor of Defendants on Compulife's remaining claims. *Id.* at 1318.

### C.    The second bench trial

On remand, from November 16 through 20, 2020, the district court conducted a bench trial of the consolidated 08 and 42 Cases. FFCL p. 3. In both Cases, the district court entered judgment in favor Defendants on the copyright infringement claims and against Defendants on misappropriation of trade secrets. FFCL p. 45.

In addressing misappropriation of trade secrets, the district court observed that this Court's findings that "Compulife's Transformative Database constitutes a trade secret" has become law-of-the-case. FFCL p. 21. In the 08 Case, the district court found liability against David and Binyomin on the grounds that David "intentionally misled Compulife in August 2011, which directly resulted in his acquisition of Compulife's Transformative Database without Compulife's permission" and that David instructed McSweeney to obtain access to the Transformative Database from MSCC for BeyondQuotes.com. FFCL pp. 37, 38 n. 28.

As to the 42 Case, the district court observed this Court's consideration of *Physicians Interactive v. Lathian Sys., Inc.*, No. CA 03-1193-A, 2003 WL 23018270 (E.D. Va. Dec. 5, 2003) ("*Physicians Interactive*") as "the most closely analogous case of which [this Court was] aware." FFCL p. 40. Based on *Physicians Interactive*'s holding that "the use of a computer software robot to **hack** into a

15

computer system and to take or copy proprietary information is an improper means to obtain a trade secret," the district court found that David, Newman, and Levy intentionally acquired Compulife's trade secrets through improper means "by using a robot to **hack** the Term4Sale website." FFCL pp. 40, 41.

As to each Defendant's conduct, the district court found that David "was heavily involved in acquiring Compulife's Transformative Database through misrepresentation and deceit" and that Levy and Newman "were directly involved in the scraping attack." FFCL p. 42. As to Binyomin, the court found that he "owned AWD, a licensed insurance agency, which he allowed his father to use to collect fees from insurance sales leads generated by Compulife's stolen Transformative Database [and] to use his insurance license and name to establish insurance-related businesses in violation of the consent decree barring him from the insurance industry." FFCL p. 42.

The district court next held that imposing joint and several liability against all Defendants is proper because "Florida's comparative fault statute specifically excludes any action based upon an intentional tort" and "[m]isappropriation of trade secrets is an intentional tort in the state of Florida." FFCL p. 41. It thus held Binyomin jointly and severally liable with David, Newman, and Levy in that "[e]ach Defendant played a critical role in the enterprise to misappropriate Compulife's trade secrets." FFCL p. 42. As to damages, the district court found that Compulife is

16

entitled to the $75,819.00 paid by MBM to AWD for sales leads MBM received from BeyondQuotes.com between September of 2011 and December of 2012 and the $108,406.87 paid by ORG to AWD in commissions from sales of insurance policies by NAAIP.org members during the period of time that NAAIP used Compulife's software.  FFCL p. 43.

Finally, the district court found that "Defendants acted willfully and maliciously in misappropriating Compulife's trade secrets" based on the following:

> . . . after Defendants' access to Compulife's internet quote engine was terminated, David Rutstein sent emails to Mr. Barney threatening to steal Compulife's customers. David Rutstein even attempted to carry out this threat by using Compulife's Term4Sale website to generate hundreds of life insurance quotes, which he then used to send messages through the Term4Sale website to Compulife's insurance agent customers stating: Compulife quote engine: Beware of security flaw. Your back office is not password protected," and providing a hyperlink to NAAIP followed by the statement "term life quote engines are free.

FFCL p. 43.  Based on this evidence, the court awarded Compulife exemplary damages against all Defendants jointly and severally.  FFCL pp. 43, 44.

All parties appealed the Final Judgment entered pursuant to the findings of fact and conclusions of law.  ECF 320, 325, 326, 327, 328.  On April 5, 2022, this Court consolidated the appeals from the 08 and 42 Cases.

17

## SUMMARY OF THE ARGUMENT

The district court erroneously held that the scraping of Compulife's Transformative Database from the Term4Sale website, which forms Defendants' liability in the 42 Case, constitutes misappropriation of trade secrets by improper means. The district court's holding is primarily predicated on *Physicians Interactive*, an unpublished opinion from the United States District Court for the Eastern District of Virginia. Relying on *Physicians Interactive*, both this Court (in the first appeal) and the district court treated the scraping as "hacking." However, the distinct factual differences of this case render *Physicians Interactive* inapposite. Indeed, the same Virginia District Court, in a subsequent, published opinion, held that a scrapping similar to the one here did not constitute "hacking" and that a website similar to Term4Sale.com failed to take any reasonable precautions to maintain the secrecy of its database. Accordingly, this Court should reverse Defendants' liability in the 42 Case, which is based solely on the scraping incident.

In addition, the district court erred in finding liability against Binyomin in both the 08 and 42 Cases based on his ownership of AWD and his permission to allow David to use his insurance license in connection with AWD. It is well established under Florida law that merely owning a company is insufficient to hold a shareholder liable as an operator of the company, absent actual participation in the

18

wrongful conduct. Nothing in the district court's findings shows Binyomin's involvement with the conduct that forms the liability in the 08 and 42 Cases.

Finally, this Court should at least vacate the Final Judgment against Binyomin and remand for further proceedings for the district court to determine whether the degree of Binyomin's wrong, if any, is the same as the degree of wrong of David, Levy, and Newman, before imposing joint and several liability against Binyomin. The district court did not make such a comparison because of its erroneous view of the law on the circumstances in which joint and several liability for misappropriation of trade secrets would be appropriate. The applicable law suggests that joint and several liability for misappropriation claims is appropriate only when the degree of wrong is the same among defendants. Thus, a remand would be appropriate here to allow the district court to make the missing findings.

## ARGUMENT

### I.      Standard Of Review

"On appeal from a bench trial, the district court's conclusions of law are reviewed de novo, but its findings of fact . . . shall not be set aside unless clearly erroneous.'" *Compulife Software*, 959 F.3d 1288, 1301 (alteration in original). "[T]he standard of review for a mixed question [of law and fact] all depends—on whether answering it entails primarily legal or factual work." *Id.* (alteration in original). "[W]hen an appellate court discerns that a district court has failed to make

a finding because of an erroneous view of the law, the usual rule is that there should be a remand for further proceedings to permit the trial court to make the missing findings." *Id.*

## II.     Scraping Publicly Available Information from a Website That Imposed No Restriction to Access Does Not Constitute Acquisition by Improper Means.

In the 42 Case, the district court erred in finding that the scraping of the Transformative Database from the Term4Sale website constitutes misappropriation of trade secrets by acquisition and by use.  FFCL p. 41.  The rationale behind this finding is that "by using a robot to ***hack*** the Term4Sale website, Defendants intentionally sought to acquire Compulife's trade secrets through improper means." FFCL p. 40.

Under section 688.002(2) of the FUTSA,[5] a person misappropriates a trade secret by acquisition when he acquires it and "knows or has reason to know that the trade secret was acquired by improper means."  FLA. STAT. § 688.002(2)(a).  Section 688.002(2) also provides that a person misappropriates a trade secret by use if the person uses it "without express or implied consent" and either "used improper means to acquire knowledge of the trade secret" or "at the time of disclosure or use, knew

---

[5]     Neither this Court nor the district court separately addressed Compulife's misappropriation of trade secrets claim under DTSA.  Instead, they applied the FUTSA standards to the DTSA, which "creates a federal cause of action that largely mirrors FUTSA." *Compulife*, 959 F.3d at 1311 n.13.

or had reason to know that her or his knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it." FLA. STAT. § 688.002(2)(b). "[M]isappropriation occurs whenever a defendant acquires the secret from its owner 'without his permission at a time when he is taking reasonable precautions to maintain its secrecy.'" FFCL p. 36 (quoting *Compulife*, 959 F.3d at 1312) ("So long as the precautions taken were reasonable, it doesn't matter that the defendant found a way to circumvent them.")) (alteration in original).

The district court characterized the website scraping as "using a robot to ***hack*** the Term4Sale website," but failed to define or otherwise elaborate on the difference between hacking and scrapping. FFCL pp. 38-41. Instead, it relied primarily, if not solely, on this Court's consideration of *Physicians Interactive* as "the most closely analogous case of which [this Court is] aware." FFCL p. 40. However, the *Physicians Interactive* is readily distinguishable and warrants a different conclusion here.

In *Physicians Interactive*, the plaintiff ran a website for physicians featuring medical product and pharmaceutical data, alleging that the defendants "hacked its website by sending electronic robots to steal its customer list, computer code, and confidential data." *Physicians Interactive*, 2003 WL 23018270, at *1. On its file server, the plaintiff maintained a confidential electronic database of the names, street addresses, and e-mail addresses of those physicians and medical professionals who

21

used plaintiff's service.  *Id.*  While the file server is connected to the Internet and is accessible by others via the Internet, "***the public, however, does not have access to [plaintiff]'s client lists***."  *Id.*  In order to use plaintiff's website, a visitor would have required a user password and a personal identification number issued by the plaintiff.  *Id.*  The website's most valuable asset is its data lists of medical professionals.  *Id.*  The defendants in *Physicians Interactive* launched various "attacks" on plaintiff's file servers to obtain the proprietary medical professional information stored on plaintiff's website.  *Id.*

The *Physicians Interactive* court first defined the term "hack" as: "to explore and manipulate the workings of a computer or other technological device or system, either for the purpose of understanding how it works or to gain ***unauthorized*** access."  *Id.* at *1 n. 1.  The court found that the "information stored on [plaintiff's] computer file server was ***not meant for the public domain*** and, therefore, was not stored in the public area of the website."  *Id.* at *8.  As such, it held that defendant's "use of a computer software robot to ***hack*** into a computer system and to take or copy proprietary information is an improper means to obtain a trade secret."  *Id.*  For this reason, the court found that plaintiff was likely to succeed on the merits and granted its motion for preliminary injunction.  *Id.*

As such, the key to the *Physicians Interactive* court's conclusion is that the defendant there, in order to obtain a trade secret, "hacked" in a computer system by

gaining "unauthorized access" to the system that was not meant for the public.  *See id.*  Unlike *Physicians Interactive*, where the retrieved information "was not meant for the public domain" and visitors needed a password and identification number before accessing to plaintiff's data, here, "the public was able to [visit Term4Sale.com] and ***pull quotes without any restriction***" before the scrapping incident occurred.  ECF 310 p. 15:1-5.  Therefore, no such "hacking" occurred in this case.

Indeed, the same Virginia district court in a subsequent, published opinion held that scrapping information from a website similar to Term4Sale.com, reformatting said information, and posting it on the "scrapper" website as its own content did not constitute "hacking."  *Cvent, Inc. v. Eventbrite, Inc.*, 739 F. Supp. 2d 927, 933-34 (E.D. Va. 2010).  The dispute in *Cvent v. Eventbrite* involved an "alleged intellectual property theft of data from plaintiff Cvent's website by [defendant Eventbrite] using a method known as 'scraping.'"  *Id.* at 930.  Similar to Compulife, the plaintiff operated a website assisting customers in organizing and locating venues for large-scale events and licensed its web-hosted software for use by companies and their meeting planners.  *Id.*  The plaintiff allegedly invested substantial resources into developing its website and database and obtained registered copyrights for its website, which are displayed on its webpages.  *Id.*  The defendant was a competitor of the plaintiff.  *Id.*  Rather than aggregating the venue

information itself, the defendant hired a computer engineer "to 'scrape' (*i.e.* copy) the information directly from [plaintiff]'s website[,] then reformatted the material into its own layouts and made it available on the Eventbrite website." *Id.*

The court held that scraping of the data from plaintiff's website was not hacking because the data at issue was "publicly available on the Internet, without requiring any login, password, or other individualized grant of access." *Id.* at 932. Moreover, the court also found that the Terms of Use[6] were "not displayed on the website in any way in which a reasonable user could be expected to notice them" and that plaintiff's "website in fact takes no affirmative steps to screen competitors from accessing its information." *Id.* The court elaborated:

> Notwithstanding [the Terms of Use], Cvent's website in fact takes no affirmative steps to screen competitors from accessing its information. Cvent's CSN venue location database is not password-protected, nor are users of the website required to manifest assent to the Terms of Use, such as by clicking "I agree" before gaining access to the database. Rather, anyone, including competitors in the field of event planning, may access and search event's venue information at will.

*Id.* The court concluded that the plaintiff's "website, including its CSN database, is therefore not protected in any meaningful fashion by its Terms of Use or otherwise." *Id.* at 933.

---

[6] The Terms of Use state in part: "No competitors or future competitors are permitted access to our site or information, and any such access by third parties is unauthorized . . . ." *Id.* (alternation in original).

The same conclusion is required here.  Just as how the plaintiff in *Cvent* ran its website, Compulife confirmed at trial that, before the scrapping incident, "the public was able to [visit Term4Sale.com] and ***pull quotes without any restriction***." ECF 310 p. 15:1-5; FFCL ¶ 9 ("Prior to September of 2016, Term4Sale.com contained no restrictions limiting the number of quotes a user could generate from Compulife's database or how the quotes were subsequently used.").  Likewise, similar to the defendant in *Cvent*, Defendants here reformatted the scrapped information before using it for NAAIP.  FFCL ¶ 53; ECF 309 p. 172:7-12.

As such, *Physicians Interactive*, which dealt with hacking a website with access restrictions, is readily distinguishable from the instant circumstances.  Instead, "the most closely analogous case" to this matter should be *Cvent*, where anyone "may access and search [the plaintiff's] information at will." *Cvent*, 739 F. Supp. 2d at 932.  Therefore, the district court's holding that "Defendants intentionally sought to acquire Compulife's trade secrets through improper means" by "hack[ing] the Term4Sale website" is erroneous.   FFCL p. 40 (replying on *Physicians Interactive* and observing: "There can be no doubt that the use of a computer software robot to ***hack*** into a computer system and to take or copy proprietary information is an improper means to obtain a trade secret, and thus is misappropriation").

Notably, this Court, relying on *E. I. duPont deNemours & Co. v. Christopher*, 431 F.2d 1012, 1014 (5th Cir. 1970), previously held that "[a]ctions may be 'improper' for trade-secret purposes even if not independently unlawful," and compared the web scraping in this case to the use of aerial photography in the *Christopher* case. *Compulife*, 959 F.3d at 1312. While *Christopher* has become widely cited in textbooks, scholarly commentaries, and treaties, this Court's decision maybe the first appellate decision in more than fifty years that has relied on *Christopher*, and which defendants were liable despite having broken no laws and having breached no contract or confidential relationship.

This Court admitted that the "most closely analogous case of which we are aware" is *Physicians Interactive*. *Id.* at 1314. However, unlike in *Physicians Interactive*, where the public did not have access to the plaintiff's client lists and needed a password and identification number before accessing to plaintiff's data, 2003 WL 23018270, at *1, it is undisputed that Term4Sale.com allows the public to use the website and generate life insurance quotes from Compulife's Transformative Database. SUF ¶¶ 5, 53.

Further, this Court's original finding that the scraping constitutes "improper means" is likely to lead to confusion. The DTSA defines "improper means" to "include[] theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, or espionage through electronic espionage or other means . . . ."

26

18 U.S.C. § 1839(6). It specifically does not include "lawful means of acquisition." *Id.* The definition of "improper means" is identical under the FUTSA. By not limiting "improper means" to the list contained in the DTSA and the FUTSA, courts are free to determine whether defendant's conduct constitutes improper means. And what is improper to one court maybe entirely proper to another court. This flexible standard is likely to lead to inconsistent outcomes among courts, whereas a more uniform standard will create greater certainty, which is beneficial to all parties, including the judiciary.

In addition, this Court should reverse the district court's ruling because Compulife did not take any "reasonable precautions to maintain [the] secrecy" of the contents of Term4Sale. FFCL p. 36. In this respect, the *Cvent* court found that plaintiff's website, including its connected database, was not "protected in any meaningful fashion by its Terms of Use or otherwise" where (i) the website took "no affirmative steps to screen competitors from accessing its information," (ii) the database was "not password-protected, nor [(iii) were] users of the website required to manifest assent to the Terms of Use . . . before gaining access to the database." *Cvent*, 739 F. Supp. 2d at 932. "Rather, anyone, including competitors . . . may access and search [the scrapped] information at will." *Id.*

The instant circumstances present an even more compelling ground to hold that the Transformative Database was "not protected in any meaningful fashion,"

27

because Compulife had no Terms of Use at all before the scraping incident, in addition to its failure to take steps to screen competitors and the fact that access to the Transformative Database through Term4Sale.com was not password-protected. Despite being aware of the possibility that Term4Sale.com could be scrapped, Compulife did nothing to protect the website. ECF 309 pp. 177:13-178:3. Specifically, Term4Sale.com did not (i) verify whether users who pulled quotes were licensees of Compulife, ECF p. 309 43:2-5, (ii) limit the number of quotes a visitor could generate, FFCL ¶ 9, or (iii) have "Terms of Use Agreement" to the website until after the scraping incident. SUF ¶¶ 43.

Therefore, this Court should reverse the judgment on misappropriation of trade secrets in the 42 Case. *See* FFCL p. 36 ("[M]isappropriation occurs whenever a defendant acquires the secret from its owner '***without his permission*** at a time when he is taking reasonable precautions to maintain its secrecy.'") (quoting *Compulife*, 959 F.3d at 1312) (alteration in original).

### III.    The District Court Erred in Finding Personal Liability against Binyomin Based on His Conduct as the Owner of AWD and His Permission to Allow David to Use His Insurance License in Connection with AWD.

As a threshold matter, the district court did not find Binyomin's liability in the 08 and 42 Cases based on his involvement with the conduct at issue. *See* FFCL p. 42. Instead, Binyomin's liability is premised on his ownership of "AWD, a licensed insurance agency, which he allowed his father to use to collect fees from

28

insurance sales leads generated by Compulife's stolen Transformative Database [and] to use his insurance license and name to establish insurance-related businesses in violation of the consent decree barring him from the insurance industry." FFCL p. 42.

However, "merely owning the stock of [AWD] is not sufficient, without more, to hold a shareholder liable as an operator of [AWD]," absent actual participation in the wrongful conduct. *Jacksonville Elec. Auth. v. Bernuth Corp.*, 996 F.2d 1107, 1110 (11th Cir. 1993); *Weekley v. Howard*, 210 So. 2d 453, 455 (Fla. 1st DCA 1968) ("Mere ownership does not make appellant liable for negligent operation thereof by one employee resulting in injury to another employee of Collins Car Wash."); *cf. Smith v. Mama Fu's Hollywood, LLC*, 08-61181-CIV, 2009 WL 10667069, at *4 (S.D. Fla. July 8, 2009) ("though [the moving defendant] is the sole member of Mama Fu's Hollywood, LLC, it doesn't own or operate the Hollywood restaurant itself, so no personal jurisdiction can be established.").

Here, absent from the district court's findings of fact is Binyomin's operation of AWD. FFCL ¶¶ 31, 32, 37. Instead, it was David who operated AWD to make the transactions at issue and conducted the scraping for NAAIP. FFCL ¶¶ 30, 31, 37. Specifically, the liability in the 08 Case is premised on David's intentional misrepresentation made to Compulife and MSCC in acquiring access to the Transformative Database for NAAIP and BeyondQuotes, which occurred in ***August***

29

*of 2011*.  FFCL ¶¶ 34, 34 n. 15, 35.  Also ***in the same month***, David caused AWD to enter into an agreement with MBM, under which AWD would receive a fee for every lead MBM received from BeyondQuotes.com that became a sale of an insurance policy.  FFCL ¶ 31.

However, David's insurance license was not revoked, and he was not barred from participating in insurance-related businesses, until after ***April 19, 2012***.  SUF ¶ 59.  By logical extension, Binyomin cannot be held "in violation of the consent decree barring [David] from the insurance industry" before April 19, 2012 – the effective date of the consent decree.  FFCL p. 42.  Therefore, the district court's imposition of joint and several liability against Binyomin for the conduct committed by David prior to April 19, 2012, upon which the liability in the 08 Case is predicated, is clearly erroneous.  FFCL p. 42.   This Court should at least reverse the liability against Binyomin in the 08 Case.

As to Binyomin's permission to allow David to use his insurance license after April 19, 2012, Binyomin should not be held personally liable.  The district court in *Florida Beauty Flora Inc. v. Pro Intermodal L.L.C.* found an individual defendant not personally liable for misappropriation of trade secrets under a similar circumstance, given the lack of evidence that the individual defendant "acted other than in his corporate capacity."  20-20966-CIV, 2021 WL 1945821, at *6 n. 10 (S.D. Fla. May 14, 2021).  The plaintiff in *Florida Beauty* only presented that the

individual defendant "'at least[ ] *discussed* plaintiff's pricing with [another defendant] but not acquiring, disclosing, or using any trade secrets." *Id.* (alteration and emphasis in original). The district court granted summary judgment in favor of the individual defendant, reasoning:

> It is worth repeating: Plaintiff cites *no evidence* showing [the individual defendant], individually and not as President or managing member of Pro Cold or Intermodal, misappropriated Plaintiff's trade secrets under any of the theories set forth in the DTSA or the FUTSA, or engaged in any fraud, intentional act, or any other conduct that would rise to a level justifying the imposition of personal liability on him.

*Id.* (alteration in original) (citing 18 U.S.C. § 1839(5); FLA. STAT. § 688.002(2)).

Here, the district court observed that an insurance agency is required by law to have an individual with an insurance agency license as the principal for that agency. FFCL ¶ 29. AWD, in compliance with this requirement, had Binyomin, a licensed insurance agent, as its principal. Tellingly, there is no evidence that Binyomin, in any capacity, acquired, disclosed, or otherwise used any trade secrets scrapped from Compulife in September of 2016, which underlies the liability in the 42 Case. Therefore, the district court erred in findings Binyomin personally liable for misappropriation of trade secrets.

As a result, this Court should reverse the liability against Binyomin in the 08 and 42 Cases.

**IV.      The District Court's Findings Lack the Specificity Required to Hold Binyomin Jointly and Severally Liable for Other Defendant's Conduct.**

The district court erred in holding Binyomin jointly and severally liable to Compulife for misappropriation of trade secrets, given the lack of finding as to the degree of Binyomin's wrong, if any, in comparison with the degree of wrong committed by David, Newman, and Levy. The district court predicated the joint and several liability against Binyomin on the logic that (i) "Florida's comparative fault statute specifically excludes 'any action based upon an intentional tort'" and that "misappropriation of trade secrets is an intentional tort." FFCL p. 41 (quoting FLA. STAT. § 768.81(4) and citing cases). Given the threats David made to Compulife and those disparaging messages David sent to Compulife's customers, the district court concluded that all Defendants are jointly and severally liable for exemplary damages, "given the collaborative efforts of all four Defendant." FFCL p. 43-44.

Absent from district court's findings of fact and conclusions of law is any discussion on the degree of fault of each alleged joint tortfeasor. *See* FFCL pp. 41-42. Put simply, the district court did not address the extent to which a person's conduct would make that person accountable for misappropriation of trade secrets committed by another person(s). *See id.*

Admittedly, neither the Federal Defend Trade Secrets Act nor the Florida Uniform Trade Secrets Act addresses this narrow issue. *See* 18 U.S.C. § 1836; FLA. STAT. § 688.004. The legal precedent in Florida also seems to be silent on this very

32

issue. Nevertheless, district courts outside this Circuit shed light on the circumstances in which joint and several liability for misappropriation of trade secrets would be appropriate. The District Court for the Northern District of California observed that joint and several liability for misappropriation claims is "reasonable where the degree of wrong is the same among the several defendants." *Brocade Communications Sys., Inc. v. A10 Networks, Inc.*, 873 F. Supp. 2d 1192, 1218 (N.D. Cal. 2012) (applying California law[7]). The District Court for Eastern District of Pennsylvania shares the same view. *Fishkin v. Susquehanna Partners, G.P.*, CIV.A.03-3766, 2007 WL 853769, at *3 (E.D. Pa. Mar. 19, 2007) ("joint and several liability for trade secret misappropriation . . . reasonable where the degree of wrong is the same among the several defendants").

Here, the district court made a general and conclusory finding on Binyomin's "critical role" in dealing with Compulife. FFCL p. 42. It did not expressly address the degree of Binyomin's wrong, which, if any, is not even comparable to the degree of wrong committed by David, Newman, and Levy. In the 08 Case, the wrongful conduct is David's [8] intentional misrepresentations of his affiliation with McSweeney or Savage to obtain access to Compulife's Transformative Database for

---

[7] "There is no true conflict between the two states' [California and Florida] laws as those laws relate to the protection of trade secrets." *Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 148 F. Supp. 2d 1326, 1334 (S.D. Fla. 2001).

[8] Newman and Levy are not defendants in the 08 Case.

NAAIP and BeyondQuotes.  FFCL ¶¶ 34, 34 n. 15, 35.  As to the 42 Case, the liability is predicated on the scraping committed by David, Levy and Newman. FFCL p. 42.  The district court found that NAAIP has been operated by David and Levy since it was founded by David in 2010.  SUF ¶ 46; FFCL ¶ 24.  It also found that Levy hired Newman, who developed the NAAIP insurance quote engine, to integrate the information scrapped from Compulife into NAAIP's database that provided life insurance quotes to users of NAAIP.org websites.  SUF ¶ 57; FFCL ¶ 51.

On the other hand, there is no findings of fact concerning Binyomin's involvement with BeyondQuotes and NAAIP at all, both of which were founded and operated by David (Rutstein) under the alias "David Gordon."  SUF ¶¶ 29, 46; FFCL ¶ 39.  This is also consistent with Barney's testimony that he never dealt with Binyomin concerning NAAIP and BeyondQuotes.  ECF 309 p. 87:1-25.  In addition, Binyomin cannot be held in violation of the consent decree barring David from the insurance industry before April 19, 2012 (the effective date of the consent decree) and should not be held accountable for David's insurance-related conduct before that date.  Any such violation of the decree after April 19, 2012 would, at most, be a violation of agency regulations,[9] not an intentional tort under Florida law.

---

[9] Barney had already reported that to the Florida Department of Financial Services.  ECF 309 p. 87:1-22.

As such, the degree of Binyomin's wrong, if any, would be much lesser than that of David, Levy, and Newman, upon which the liability is predicated, and, by logical extension, less than David's willful and malicious conduct (found by the district court) in threatening and disparaging Compulife. FFCL ¶¶ 44, 45. Florida law should not hold Binyomin jointly and severally liable for other Defendants' intentional conduct under the circumstances, merely because Binyomin's alleged violation of an administrative order to which he was not even a party.

Consequently, the district court incorrectly held Binyomin jointly and severally liable for the other Defendants' conduct without comparing the degree of Binyomin's wrong to the degree of wrong committed by David, Levy, and Newman. This Court should vacate the judgment against Binyomin and "remand for further proceedings to permit the trial court to make the missing findings." *Compulife*, 959 F.3d at 1301.

## CONCLUSION

For the foregoing reasons, this Court should reverse the Final Judgment against Binyomin Rutstein or, in the alternative, vacate the Final Judgment and remand for further proceedings for the district court to determine whether the degree of Binyomin Rutstein's wrong is the same as those of David Rutstein, Aaron Levy, and Moses Newman, before imposing joint and several liability against Binyomin Rutstein.

Date: May 16, 2022                          Respectfully submitted,

                                            DIAZ REUS & TARG, LLP

                                            Michael Diaz
                                            Marta Colomar Garcia
                                            Zhen Pan
                                            100 Southeast Second Street
                                            3400 Miami Tower
                                            Miami, Florida 33131
                                            mdiaz@diazreus.com
                                            mcolomar@diazreus.com
                                            zpan@diazreus.com
                                            *Attorneys for Binyomin Rutstein*

## **CERTIFICATE OF COMPLIANCE**

The undersigned certifies that the foregoing Brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B).  This brief contains 8,286 words, excluding the parts exempted by FED. R. APP. P. 32(f).

The undersigned also certifies that the Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word in Times New Roman in 14-point type.

By: */s/ Zhen Pan*
Zhen Pan

37

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 16, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive notices of filing electronically.

By: */s/ Zhen Pan*
Zhen Pan

38