NOS. 21-14071 & 21-14074

# United States Court of Appeals

## For The Eleventh Circuit

**COMPULIFE SOFTWARE, INC.**
*Plaintiff-Appellee-Cross Appellant*

v.

**BINYOMIN RUTSTEIN, A.K.A., BEN RUTSTEIN, DAVID RUTSTEIN**
*Defendant-Appellant-Cross Appellee*

**COMPULIFE SOFTWARE, INC.**
*Plaintiff-Appellee-Cross Appellant*

v.

**MOSES NEWMAN, AARON LEVY, DAVID RUTSTEIN, A.K.A. DAVID ANTHONY GORDON, A.K.A. BOB GORDON, A.K.A. NATE GOLDEN, BINYOMIN RUTSTEIN, A.K.A. BEN RUTSTEIN**
*Defendant-Appellant-Cross Appellee*

**APPELLEE COMPULIFE'S ANSWER BRIEF AND CROSS-APPELLANT COMPULIFE'S OPENING BRIEF**

JOEL B. ROTHMAN
LAYLA T. NGUYEN
**SRIPLAW, P.A.**
21301 Powerline Road, Suite 100
Boca Raton, FL 33433
561.404.4350
*Attorneys for Appellee and Cross-Appellant Compulife Software Inc.*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT (CIP)

11th Cir. R. 26.1-1(a) requires the appellant or petitioner to file a Certificate of Interested Persons and Corporate Disclosure Statement (CIP with this court within 14 days after the date the case or appeal is docketed in this court, and to include a CIP within every motion, petition, brief, answer, response, and reply filed. Also, all appellees, intervenors, respondents, and all other parties to the case or appeal must file a CIP within 28 days after the date the case or appeal is docketed in this court. In alphabetical order, with one name per line, please list all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party.

| |
|---|
| Allison L. Friedman, P.A. |
| Barney, Robert |
| Compulife Software, Inc. |
| Diaz, Michael Jr. |
| Diaz, Reus & Targ, LLP |
| Friedman, Allison L. |

| |
|---|
| Gulisano Law, PLLC |
| Gulisano, Michael |
| Johnson, Ahmand |
| Pan, Zhen |
| Reinhart, Bruce E. (Magistrate Judge) |
| Rosenberg, Robin L. (District Judge) |
| Rothman, Joel B. |
| Rutstein, Binyomin |
| Rutstein, David Brian |
| SRIPLAW |
| McCarthy, Brooke |
| Sugg, Caleb |
| Bishop, Tory |
| Kutak Rock LLP |

## REQUEST FOR ORAL ARGUMENT

Oral argument would be helpful for this Court to understand the questions presented on appeal for the second time in these consolidated cases, in particular, the district court's failure to find in favor of Compulife for copyright infringement.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT (CIP) .......................................................... ii

REQUEST FOR ORAL ARGUMENT .................................................. iv

TABLE OF CONTENTS.............................................................................v

TABLE OF AUTHORITIES ................................................................. vii

I.    JURISDICTIONAL STATEMENT ON CROSS-APPEAL..........................1

II.   STATEMENT OF ISSUES PRESENTED FOR REVIEW ON CROSS-
      APPEAL .............................................................................................2

III.  STATEMENT OF THE CASE ......................................................3

   A.   The Second Compulife Trial .......................................................3

        1.    Compulife's Transformative Database ....................................6

        2.    Compulife's Copyrighted HTML Source Code....................8

IV.   STANDARD OF REVIEW....................................................................13

V.    SUMMARY OF THE ARGUMENT ........................................................15

VI.   ARGUMENT........................................................................................19

   A.   The District Court Correctly Applied the Law-of-the-Case Doctrine on
        Remand. .....................................................................................19

   B.   The District Court Correctly Determined that the Defendants' Scraping
        Attack Amounted to the Acquisition of Compulife's Trade Secrets by
        Improper Means and Use .........................................................28

   C.   The District Court Correctly Determined that the Defendants' Scraping
        Attack Obtained Enough Data from Compulife's Transformative Database
        to Constitute Appropriation .......................................................32

   D.   The District Court's Application of Joint and Several Liability for Trade
        Secret Misappropriation to All of the Defendants, including to Binyomin
        Rutstein, Should be Affirmed ...................................................35

   E.   Compulife Proved Copyright Infringement and the District Court's
        Contrary Determination Should be Reversed on Compulife's Cross
        Appeal .......................................................................................41

        1.    Chris Bruner, Nancy Miracle and Robert Barney Testified that the
              Organization and Arrangement of the Compulife HTML was Original

and Creative, and Defendants Offered no Contrary Evidence. ............46

2.    Compulife Proved Both the Qualitative and Quantitative Significance of Defendants' Copying of 2010 HTML Source Code ........................53

VII. CONCLUSION.............................................................................................56

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS ...............................58

CERTIFICATE OF SERVICE .............................................................................59

# TABLE OF AUTHORITIES

## Cases

*Alphamed, Inc. v. B. Braun Medical, Inc.,*
367 F.3d 1280, 1285 (11th Cir. 2004) ..............................................................13

*Anderson v. Bessemer City*,
470 U.S. 564, 573 (1985).................................................................................13

*Barton Protective Servs., Inc. v. Faber*,
745 So.2d 968, 975 (Fla. 4th DCA 1999).........................................................36

*Basel v. McFarland & Sons, Inc*.,
815 So. 2d 687, 691 (Fla. 5th DCA 2002).........................................................36

*Bassett v. Mashantucket Pequot Tribe,*
204 F.3d 343, 360 (2d Cir. 2000) ....................................................................35

*Bovie Med. Corp. v. Livneh*,
No. 8:10-CV-1527-T-24EAJ, 2010 WL 5297172, at *6 (M.D. Fla. Dec. 20,
2010) .................................................................................................................35

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*,
873 F. Supp. 2d 1192, 1218 (N.D. Cal. 2012)..................................................39

*BUC Int'l Corp. v. Int'l Yacht Council Ltd.*,
489 F.3d 1129, 1142 (11th Cir. 2007) ..............................................................51

*Christianson v. Colt Indus. Operating Corp.*,
486 U.S. 800, 817, 108 S.Ct. 2166, 2178, 100 L.Ed.2d 811 (1988) .................22

*Compulife Software Inc. v. Newman*,
959 F.3d 1288 (11th Cir. May 20, 2020)................................................... passim

*Cvent, Inc. v. Eventbrite, Inc.*,
739 F. Supp. 2d 927, 932 (E.D. Va. 2010) .......................................................31

*Del Monte Fresh Produce Co. v. Dole Food Co.*,
148 F. Supp. 2d 1326, 1338 (S.D. Fla. 2001)...................................................35

*Fabre v. Marin*,
  623 So. 2d 1182, 1184 (Fla. 1993) ....................................................37

*Feist Publications, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 1(1991)............................................................... 41, 49

*First Fin. USA, Inc. v. Steinger*,
  760 So.2d 996, 997–98 (Fla. 4th DCA 2000).....................................39

*Fishkin v. Susquehanna Partners,*
  *G.P.*, No. 03-3766, 2007 U.S. Dist. LEXIS 19621, at *9 (E.D. Pa. Mar. 19, 2007) ....................................................................................38

*Friedman v. Mkt. St. Mortg. Corp.*,
  520 F.3d 1289, 1294 (11th Cir. 2008) .............................................19

*GE Betz, Inc. v. Conrad,*
  231 N.C. App. 214, 235–36, 752 S.E.2d 634, 650 (2013) .................................36

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
  471 U.S. 539, 565 (1985)..............................................................54

*Hawkins v. Ceco Corp.*,
  883 F.2d 977, 981-82 (11th Cir. 1989)............................................14

*Heathcoat v. Potts*,
  905 F.2d 367, 370 (11th Cir. 1990) ..................................................19

*In re Sanford Fork & Tool Co.,*
  160 U.S. 247, 255 (1895)..............................................................20

*Lincoln v. Bd. of Regents*,
  697 F.2d 928, 939 (11th Cir. 1983) ..................................................14

*Litman v. Massachusetts Mut. Life Ins. Co.*,
  825 F.2d 1506, 1510–11 (11th Cir. 1987) ..........................................20

*Mapei Corp. v. J.M. Field Mktg., Inc,*
  295 So. 3d 1193, 1197 (Fla. 4th DCA 2020).....................................31

*Mfrs. Cas. Ins. Co. v. Intrusion-Prepakt, Inc.*,
  264 F.2d 758, 760 (5th Cir. 1959) ......................................................14

*Microsoft Corp. v. Cietdirect.com LLC*,
  No. 08-60668-CIV, 2008 WL 3162535, at \*6 (S.D. Fla. Aug. 5, 2008)............37

*Owen v. Sec'y for the Dep't of Corr.*,
  568 F.3d 894, 907 (11th Cir. 2009) ....................................................13

*Peter Letterese And Assocs., Inc. v. World Inst. Of Scientology Enterprises*,
  533 F.3d 1287, 1307 (11th Cir. 2008). ...............................................53

*Piambino v. Bailey*,
  757 F.2d 1112, 1120 (11th Cir.1985) ...................................................20

*Robinson v. Parrish*,
  720 F.2d 1548, 1549–50 (11th Cir.1983) ............................................19

*Salton, Inc. v. Philips Domestic Appliances & Pers. Care B.V.*,
  391 F.3d 871, 877 (7th Cir. 2004) ......................................................37

*Schiavo ex rel. Schindler v. Schiavo*,
  403 F.3d 1289, 1291 (11th Cir. 2005) ........................................... 19, 21

*This That And The Other Gift And Tobacco, Inc. v. Cobb Cnty., Ga.*,
  439 F.3d 1275, 1284 (11th Cir. 2006) ................................................22

*Thornton v. J Jargon Co.*,
  580 F. Supp. 2d 1261, 1273 (M.D. Fla. 2008)...................................53

*Transamerica Leasing, Inc. v. Inst. of London Underwriters*,
  430 F.3d 1326, 1331 (11th Cir. 2005) ...............................................19

*UAB "Planner5D" v. Facebook, Inc.*,
  No. 19-cv-03132-WHO, 2020 U.S. Dist. LEXIS 133542, at \*23 (N.D. Cal. July 24, 2020) ...............................................................................31

*United States v. Frank*,
  599 F.3d 1221, 1228 (11th Cir. 2010) ...............................................13

*United States v. Jordan*,
   429 F.3d 1032, 1035 (11th Cir. 2005) ...............................................22

*United States v. Robinson*,
   690 F.2d 869, 872 (11th Cir. 1982) ...................................................22

*Vance v. Tire Eng'g and Distribution, LLC*,
   32 So.3d 774, 776 (Fla. 2d DCA  2010)............................................35

**Statutes**
17 U.S.C. § 102 ..............................................................................................42
28 U.S.C. § 1291 ..............................................................................................1
Fla. Stat. § 668.803 ........................................................................................31
Fla. Stat. § 688.002 ........................................................................................34
Fla. Stat. § 768.81(4)......................................................................................36

**Rules**
Fed. R. Civ. P. Rule 52(a) ...........................................................................13

**Treatises**
3 Nimmer on Copyright § 14.04[E][2][d] (2004)....................................35
4 Nimmer on Copyright § 13.03[F][5] (2019)........................................56

## I.  JURISDICTIONAL STATEMENT ON CROSS-APPEAL

Compulife Software, Inc. cross-appeals the final judgment entered after trial by the United States District for the Southern District of Florida, West Palm Beach Division, Magistrate Judge Bruce E. Reinhart (by consent) in *Compulife Software, Inc., v. Rutstein et. al.*, 9:16-CV-80808-BER, DE 314 (the "08 Case") and *Compulife Software, Inc., v. Moses Newman et. al.*, 9:16-CV-81942-BER, DE 317 (the "42 Case"), which were consolidated for trial and post-trial proceedings.

The original final judgment was entered on October 20, 2021. (08 Case, DE 317; 42 Case, DE 313). Compulife timely filed its notices of appeal from that final judgment on November 19, 2021. (08 Case, DE 327; 42 Case, DE 323). On December 1, 2021, the district court requested that the parties agree to permit this Court to relinquish jurisdiction to permit the district court to amend the final judgment because it did not contain judgment for defendants on Compulife's copyright infringement claims. (08 Case, DE 332; 42 Case, DE 359). This Court agreed to relinquish jurisdiction (08 Case, DE 362), and on January 18, 2022, the district court entered its amended final judgment dismissing Compulife's copyright infringement claims. (08 Case, DE 363; 42 Case, DE 404). Compulife timely filed notices of appeal from the amended judgment on February 14 and 15, 2022. (08 Case, DE 370; 42 Case, DE 421). This Court has jurisdiction to review final orders pursuant to 28 U.S.C. § 1291.

1

## II.    STATEMENT OF ISSUES PRESENTED FOR REVIEW ON CROSS-APPEAL

1.    Whether the district court's determination that Compulife's code was not entitled to copyright protection was error because the district court, in assessing whether Compulife's 2010 HTML Source Code met the extremely low threshold for originality and creativity on which copyrightability is judged, looked only at the "variables and parameters" contained in Compulife's code in the abstract, and completely ignored the uncontradicted lay and expert evidence that the overall organization and arrangement of the variables and parameters in Compulife's code was original, creative, and entitled to copyright protection.

### III.    STATEMENT OF THE CASE

The facts of this case were well and accurately summarized by this Court in *Compulife Software Inc. v. Newman*, 959 F.3d 1288 (11th Cir. May 20, 2020) ("*Compulife I*"). This brief assumes the Court's familiarity with its prior decision in *Compulife I* issued after the first bench trial in this case in which this Court reversed and remanded for a new trial.

The evidence presented at the second bench trial was substantially similar to the evidence at the first trial. Compulife has gone into greater detail below concerning the evidence of its Transformative Database that is a subject of the main appeal and Compulife's HTML Code that is the subject copyright infringement claims at issue on its cross-appeal. As to the facts concerning the defendants' appeal, while Compulife does not concede the factual recitations provided by defendants in their briefs, in the interests of brevity Compulife believes that this Court's prior opinion provides a better summary. Furthermore, with the exception of the facts recounted in the district court's analysis of Compulife's copyright infringement claim in section II of its decision below (08 DE 314 and 42 DE 310 at 22-34), the decision of the district court also provides a better factual summary than those provided by the defendants.

#### A. The Second Compulife Trial

Following remand, the parties consented to trial before Magistrate Judge Bruce Reinhardt; Judge Reinhardt replaced Magistrate Judge Hopkins who

3

presided over the first trial.[1] (08 DE 314 at 1-2, n. 1). The second trial was held by

remote video before Judge Reinhart from November 16 through November 20,

2020. (08 DE 314 at 3).

With certain limited exceptions, the parties did not rely on the evidence or

the record from the first trial[2]; most of the witnesses who testified at the first trial

---

[1] Compulife cites the record in the 9:16-CV-80808 case below as "08" and the record in the 9:16-CV-81942 case as "42." "DE" refers to docket entry and when used the corresponding docket entry number follows. "PX" refers to Plaintiff's Exhibits admitted in the second trial. Plaintiff's exhibits that were admitted in the second trial are located in both the 08 Case (DE 295 and 304), and in the 42 Case (DE 302 and 307).

[2] In the first trial, the court heard the live testimony of Christopher Bruner (42 DE 192 at 3-43); Nancy Miracle (42 DE 192 at 43-66, 42 DE 193 at 1-41); Jeremiah Kuhn (42 DE 193 at 41-94); Brian McSweeney (42 DE 194 at 4-56); Robert Barney (42 DE 195 at 15-106; 42 DEF 196 at 4-98); Defendant Moses Newman (42 DE 197 at 11-49); and Defendant David Rutstein (42 DE 197 at 50-100; 42 DE 214 at 15-87). The Court received deposition designations for Defendant Binyomin Rutstein and watched the video of the designated portions during the trial. (42 DE 193 at 95-96; 42 DE 194 at 3-4); (Deposition Designations, 08 DE 179 at 1-2, 42 DE 194 at 3); (Video File on DVD, 08 DE 200); (Deposition Transcript, 08 DE 196-2). The Court also received deposition designations for Anthony Wilson of One Resource Group; the parties read the designated portions out loud during the trial. (Deposition Designations, 08 DE 150 at 1-2; 08 DE 151 at 1-2; '08 DE 179 at 3-4); (Deposition Transcript, 08 DE 196-1). The Court additionally received deposition designations for Defendant Aaron Levy; the Court reviewed the designated portions in chambers. (42 DE 195 at 11; 42 DE 197 at 102); (Deposition Designations, 08 DE 150 at 2; 08 DE 179 at 2-3); (Video File on DVD, 08 DE 200).

At the January 24, 2018 evidentiary hearing, the court heard the live testimony of Robert Barney, (08 DE 221 at 12:20-24), received additional exhibits, and received deposition designations for defendant Moses Newman, (08 DE 221 at 30:25-31:22).

testified anew.[3] This includes the live testimony of: Robert Barney, founder and president of Compulife (08 DE 308, pp. 35-49; 08 DE 309, pp. 1-118); Chris Bruner, Compulife's Programmer (08 DE 309, pp. 118-187; 08 DE 310, pp. 1-30); Jeremiah Kuhn, Compulife's chief financial officer and chief operating officer (08 DE 310, pp. 30-118); Nancy Miracle, Compulife's expert witness (08 DE 310, pp. 118-148; 08 DE 311, pp. 1-109); defendant Moses Newman (08 DE 311, pp. 109-122; 08 DE 312, pp. 46-48), and defendant David Rutstein (08 DE 311, pp. 122-202; 08 DE 312 pp. 4-41). Defendants Binyomin Rutstein and Aaron Levy did not attend both trials.

The only witness who did not give live testimony at the second trial but who testified at the first trial is Brian McSweeney, a former Compulife customer. (08 DE 194). In lieu of live testimony, and with the parties' agreement, the court received the transcript of the testimony of Brian McSweeney, from the first trial. (PX 269). The court also received deposition testimony of Michael Steinhardt of MSCC (PX 566), Anthony Wilson of One Resource Group (PX 565), defendant Binyomin Rutstein (PX 564), and defendant Aaron Levy (PX 563).

The evidence most relevant to this appeal and cross-appeal concerns Compulife's Transformative Database and Compulife's 2010 HTML Source Code.

---

[3] The transcripts of the second trial are located in the record in only the 08 Case at docket entries 308-312.

### 1.    Compulife's Transformative Database

In the second trial, as in the first, Compulife presented evidence of its

Transformative Database that is crucial to its business of quoting insurance rates.

> Compulife maintains a database of insurance-premium information—called the "Transformative Database"—to which it sells access. The Transformative Database is valuable because it contains up-to-date information on many life insurers' premium-rate tables and thus allows for simultaneous comparison of rates from dozens of providers. Most of Compulife's customers are insurance agents who buy access to the database so that they can more easily provide reliable cost estimates to prospective policy purchasers. Although the Transformative Database is based on publicly available information—namely, individual insurers' rate tables—it can't be replicated without a specialized method and formula known only within Compulife.

*Compulife I*, 959 F.3d at 1296.

There is a difference between insurance *rates* and insurance *quotes*: rates are

one of the "raw materials" used in developing an insurance premium for a policy;

rates are never given to a consumer. (08 DE 308, 45:25-46:1).  Rather, rates are

used to calculate the *premium* which is given to a consumer to tell them how much

the insurance will cost. (08 DE 308, 46:3-5). Compulife receives rate information

from a number of sources. Many life insurance companies publish rate books and

rate charts. (08 DE 308, 41:12-13). For life insurance companies that do not

publish their rates, Compulife has relationships with these companies to obtain

their rate information. (08 DE 308, 41:16-42:1). Most life insurance companies

provide Compulife with rate information in a timely manner. (08 DE 308, 42:3-4).

Compulife's system includes rate tables from over a hundred companies. (08 DE

309, 5:3). Compulife's Transformative Database generates quotes mathematically using the rate information and a combination of inputs. (08 DE 310, 14:2-19).

Generally, insurance rates are public information. (08 DE 308, 42:10). However, for the information to be useful it must be current. (08 DE 308, 42:10-12). Over the years, Compulife developed a good working relationship with a majority of the insurance companies they quote, which has led to many companies giving the rate tables in advance, before they are released to the public. (08 DE 308, 42:15-24). In exchange, Compulife gives its compilation of rate information to insurers who provide that information to Compulife. Insurers provide the rate information in the form of a quoting tool so that insurers can review it in advance before Compulife releases its updated software to the public. (08 DE 308, 42:20-24, 48:9-15).

When Compulife receives rate information from insurers, sometimes as frequently as every month, Barney enters the rate information into Compulife's system using Compulife's proprietary "back office" software and database. (08 DE 308 42:4-7, 44:16-18, 44:20-45:9; 08 DE 309, 123:4-19). This proprietary system was designed solely by Compulife, and is not the product of another software database. (08 DE 309, 45:6-9). The Transformative Database is valuable because it contains up-to-date information on many life insurers' premium-rate tables. *Compulife I,* 959 F.3d at 1296. The premium-rate tables information allows for

7

simultaneous comparison of rates from dozens of providers. *Id.*

Compulife assigns its own internal four-letter company codes to the different insurance companies whose insurance policy information it inputs into in its database. (08 DE 309, 157:18-158:9, PX 109). Compulife updates its rate information in its database and provides those updates to its customers on a monthly basis. (08 DE 308, 48:17-19; 08 DE 309, 123:20-23). Because the data files could be reverse engineered if not protected, Compulife designed an encryption system. (08 DE 308, 45:12-20). When the data is stored and someone outside the company looks at the data files, it will view as if it is "it just looks like a bunch of garbage." (08 DE 308, 45:12-20).

### 2.    Compulife's Copyrighted HTML Source Code

In the second trial, as in the first, Compulife presented evidence of its 2010 HTML Source Code that is used to operate Compulife's web quoter.

> The web-quoter feature allows the PC licensee to put a quoter on its own website, which it can then use as a marketing tool to attract customers. Once a licensee's website is equipped with the web quoter, prospective life-insurance purchasers can enter demographic information into fields on the licensee's site and receive quotes directly from the licensee. Unlike the PC quoter[4]—which contains its

---

[4]  This Court previously explained the two authorized ways a user can access Compulife's Transformative Database:

> Compulife sells two different kinds of access to the Transformative Database—a "PC version" and an "internet-engine version"—each run by its own piece of software and each accompanied by its own type of license. Both pieces of software contain an encrypted copy of

own local copy of the Transformative Database—the web quoter generates quotes by communicating with an internet-quote engine hosted on Compulife's server. The HTML source code of the web quoter is protected by a registered copyright.

*Compulife I*, 959 F.3d at 1296.

Chris Bruner, a thirty-year Compulife employee, wrote the Compulife HTML Source Code.  (08 DE 309, 119:6-7, 128:13-17; 08 DE 310, 22:17). Compulife's 2010 HTML Source Code was registered with the Copyright Office on May 29, 2015 and assigned Reg. No. TX-8-106-364. (08 DE 309, 131:15-21, PX 153, 542).

When a person accesses a website that contains Compulife's HTML Source Code, Compulife HTML Source Code gathers information from the end user like age, sex, smoking, status, and details about the type of life insurance requested, and then the HTML calls the Compulife Internet quote engine (written in C++ code). (08 DE 309, 121:11-17; 08 DE 310, 27:18-23).  The Internet quote engine will then pass the information to the C++ code. (08 DE 310, 27:18-23). The C++ code then does the information lookup, goes to the template files, calculates an

_____

the database. The PC-version software—called the "PC quoter"—is sold along with a PC license that allows licensees to install copies of the quoter on their personal computers and other devices for (depending on the number of devices) a cost of either $180 or $300 per year. The PC quoter uses its local copy of the Transformative Database to generate insurance-rate estimates corresponding to demographic information entered by the end user.

*Compulife I*, 959 F.3d at 1296.

insurance quote, and passes the information back to the HTML source code. (08 DE 310, 27:18-23). The quote is then displayed on the website. (08 DE 310, 27:18-23).

To accomplish the task of looking up insurance quotes for a user, the HTML Source Code contains different sections or blocks of code. (08 DE 309, 139:10-20). Each section or block of code relates to the different information needed from a user to produce an insurance quote. Each of these blocks of code were written in an original way by Compulife's programmer Bruner.

| Code Section | Code Parameter | Code Description |
|---|---|---|
| State Selection code; 57 lines | "State" | The State Selection code translates each state name into a number instead of into two letter acronyms and contains two New York entries. (08 DE 309, 146:13-19) |
| Birth Month Selection code; 13 lines | "BirthMonth" | The Birth Month Selection code translates each month to a number and uses "camel case" where two words are combined without a space between them where the second capitalized word forms a "hump" like a camel. (08 DE 309, 148:6-22) |
| Birthday Selection code; 32 lines | "Birthday" | The Birthday Selection code creates a dropdown of days in a month numbered 1 through 31. (08 DE 310, 9:8-16). |

10

| Code Section | Code Parameter | Code Description |
|---|---|---|
| Birth Year code; 99 lines | "BirthYear" | The birth year selection code creates a dropdown of years from 1910 through 2008 and uses "camel case." (08 DE 309, 148:24-25) |
| Gender Selection code; 2 lines | "Sex" | Compulife's HTML offers a choice between "male" and "female" with "radio button" option. (08 DE 309, 149:14-16) |
| Smoker/Tobacco code; 2 lines | "Smoker" | The smoker/tobacco code defines a "radio button" to choose between smoker or non-smoker (but it could have been written to use a drop-down choice instead). (08 DE 309, 149:19-150:1-3) |
| Health Class (Insurance Category) code; 5 lines | "Health" | This code defines health by different insurance classifications: PP for preferred plus, P for preferred, RP for regular plus, and R for regular. (08 DE 309, 150:9-12) |
| Type of Insurance code; 35 lines | "New Category" | This code chooses the type of life insurance being quoted, e.g. 10 Year Term, 20 Year Term, 30 Year Term, etc. (08 DE 309, 152:20-23, PX 567 at 20-21) |
| Payment Option code; 5 lines | "ModeUsed" | This code obtains the annual premium as well as the "modal" premium: monthly, quarterly, or semi-annual. (08 DE 309, 142:2-5) |
| Sorting Output code; 2 lines | "SortOverride1" | This code sorts premium amounts quoted by annual premium from lower to higher values; if the "ModeUsed" parameter is changed to monthly, this results in sorting by monthly values instead. (08 DE 309, 155:3-11). |

11

| Code Section | Code Parameter | Code Description |
|---|---|---|
| Face Amount code; 25 lines | "FaceAmount" | This code defines the amount of life insurance quoted in increments from $50,000 up to $5M. (08 DE 309, 14:15, 142:19-24) |
| Minimum Life Company Rating code; 17 lines[5] | "CompRating"[5] | This code defines the minimum rating for the life insurance company quoted from A++ down to F, or "Quote all with Best Rating." (08 DE 309, 159:21-160:1; PX 107). |

In order for the Compulife HTML Source Code to communicate properly with the Compulife Internet Quote Engine, the HTML code must send the engine the correct parameters and variables defined in the HTML code. (08 DE 309, 121:18-25). All the parameters must be present, spelled correctly and provided in the correct order in order for the software to produce quotes. (08 DE 309, 121:18-22). It must be a one-to-one match in order for the internet engine to look up the insurance rates in Compulife's Transformative software and produce a life insurance quote. (08 DE 310, 27:24-29:3).

---

[5] The district court's Order did not discuss this parameter. It is unclear why the court did not discuss this parameter when the robot that scraped Compulife's Transformative Database used the CompRating parameter in its "get" requests. Nancy Miracle testified that this parameter was used in the scraping attack. (08 DE 311, 25:9-15) ("Go down a little bit more, here called minimal life company rating, that is comp rating. In fact, during the scrape it was set to four, but you could, at least in theory, get more numbers, at which point you could multiply the result by four again, and that is how you calculate it. The answer is, maximum, around 80 million for two states.").

## IV.    STANDARD OF REVIEW

On an appeal from a judgment in a bench trial, this Court reviews the district court's conclusions of law *de novo*, but its findings of fact shall not be set aside unless clearly erroneous. *Compulife I,* 959 F.3d at 1301. This Court reviews *de novo* the district court's application of the law to the facts. *United States v. Frank*, 599 F.3d 1221, 1228 (11th Cir. 2010). Mixed questions of law and fact are also reviewed *de novo. Owen v. Sec'y for the Dep't of Corr.*, 568 F.3d 894, 907 (11th Cir. 2009).

A district court's application of the law-of-the-case doctrine is reviewed *de novo*. *Alphamed, Inc. v. B. Braun Medical, Inc.,* 367 F.3d 1280, 1285 (11th Cir. 2004).

Findings of fact are evaluated under the clear-error standard. Fed. R. Civ. P. Rule 52(a) ("Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."); *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985). A factual finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson,* 470 U.S. at 573. Clear error exists where (1) the findings are without substantial evidence to support them, (2) the court misapprehended the effect of the evidence, and (3) if, although

13

there is evidence which if credible would be substantial, the force and effect of the testimony, considered as a whole, convinces the Court that the findings are so against the great preponderance of the credible testimony that they do not reflect or represent the truth and right of the case. *Mfrs. Cas. Ins. Co. v. Intrusion-Prepakt, Inc.*, 264 F.2d 758, 760 (5th Cir. 1959). "While this court accords substantial deference to the district court's findings, this deference is not unlimited and 'we will hold a finding of fact clearly erroneous if the record lacks substantial evidence to support it'." *Hawkins v. Ceco Corp.*, 883 F.2d 977, 981-82 (11th Cir. 1989) (quoting *Lincoln v. Bd. of Regents*, 697 F.2d 928, 939 (11th Cir. 1983)).

## V.    SUMMARY OF THE ARGUMENT

The district court correctly applied the law-of-the-case doctrine to the determination that Compulife's Transformative Database is a protectible trade secret. None of the exceptions to the application of law-of-the-case apply here. The finding that Compulife's Transformative Database was a trade secret was not challenged below, nor did defendants introduce new or different evidence to show that Compulife was not entitled to protect the Transformative Database as its trade secret. The "additional evidence" the defendants refer to concerning the execution of a license by MSCC in May of 2015 is not new or different. Mr. Steinhardt's company MSCC – which like Compulife is in the software business – always treated Compulife's software as if it were licensed and MSCC always respected the software as Compulife's trade secret. The defendants never showed that Compulife failed to protect its Transformative Database either. The district court's reliance on law-of-the-case was justified.

The district court correctly determined that the Defendants' web scraping of Compulife's Term4Sale website using a software robot was misappropriation of trade secrets by use or acquisition. In *Compulife I,* this Court determined that data scraping is a type of actionable trade secret misappropriation. *Compulife I,* 959 F.3d at 1299. Defendants improper attempt to reargue that finding on this second appeal should be rejected. Furthermore, the mere fact that Compulife's Term4Sale

website offered individual quotes for free to the public did not eliminate the possibility that so many of those quotes could be acquired by non-manual automated processes as to amount to misappropriation. That was the district court's finding, and there is no basis to disturb it on appeal.

The district court's determination that the defendants' scraping attack stole a significant enough portion of Compulife's data, and knowingly incorporated that stolen data into its own websites to constitute improper means was also correct and should be affirmed on appeal. Mr. Newman, who admitted that "no one wants to be scraped," claimed that there were 3.5 million quotes scraped from Compulife's website in the defendants' database. Defendants operated a quoting website using Compulife's stolen data; what defendants stole is clearly enough. Compulife's expert's estimate of defendant's theft was higher: 43.5 million quotes from a scraping attack that could have produced up to 80 million results. There was more than sufficient evidence to demonstrate that "the block of data that the defendants took was large enough to constitute appropriation of the Transformative Database itself," which is what the district court held.

The district court's imposition of joint and several liability was also proper. Trade secret misappropriation is an intentional tort to which comparative fault rules do not apply. When defendants act in concert to commit a wrong like these defendants did, each defendant is liable for the plaintiff's entire injury, and the

victim – Compulife here – may recover all of its damages from any one of the defendants. Binyomin Rutstein, the owner, officer and agent of AWD, cannot escape joint and several liability and it was within the trial court's discretion to impose it for both compensatory and exemplary damages.

On Compulife's cross-appeal of the district court's determination that Compulife's HTML Source code was unprotectible, this Court, reviewing the record and the district court's findings *de novo*, should reverse. There was ample evidence in the record that the organization and arrangement of Compulife's HTML code was original and minimally creative to entitle Compulife to copyright protection. The district court never viewed the organization and arrangement of the code as a whole and this was its error.

The Compulife 2010 HTML Code that defendants copied is made up of eleven code blocks: "State", "BirthMonth", "Birthday", "BirthYear", "Sex", "Smoker", "Health", "NewCategory", "ModeUsed", "SortOverride1", and "FaceAmount." The order they appear in above is the order they must appear in the copied code for the HTML to work properly and return quotes. Compulife's programmer Bruner chose the organization of those code blocks himself. The defendants failed to offer any evidence to show that the organization or arrangement of those code blocks was anything other than original and creative. The organization and arrangement of the eleven parameters for the variables

required to return an insurance quote is not dictated by any outside source, nor was there any testimony or evidence to demonstrate that, for example, "State" must come first always, followed by "BirthMonth", followed by "Birthday" and then "BirthYear", etc.

The eleven code blocks in Compulife's HTML could have been arranged differently in up to over 39 million permutations without repeating any of the code blocks. But the district court never considered the overall organization and arrangement of Compulife's HTML. Had the district court considered the overall organization and arrangement of the code blocks and sections, as well as the individual variables and parameters, it would have concluded that the organization and arrangement was protectible expression. Defendants failed to demonstrate otherwise and offered no evidence in opposition. Regardless of whether this Court views the district court's decision on filtration *de novo* or through the lens of the clear error rule, reversal is required.

# VI.    ARGUMENT

## A. The District Court Correctly Applied the Law-of-the-Case Doctrine on Remand.

The district court correctly determined that it was bound by four findings made by this Court in *Compulife I* as law-of-the-case.

> The first establishes the existence and validity of Compulife's copyright. *Compulife I*, 959 F.3d at 1301. The second is that Defendants engaged in factual copying. *Id*. at 1302. The third is that Compulife's alphabetization of the 50 states is "unoriginal and unprotectable." *Id*. at 1307. The fourth is that Compulife's Transformative Database constitutes a trade secret. *Id*. at 1311.

(08 DE 314 at 21) (footnotes omitted).

The law-of-the-case doctrine is well settled and "preclude[s] courts from revisiting issues that were [already] decided." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1291 (11th Cir. 2005). Application of law-of-the-case results in "findings of fact and conclusions of law by an appellate court" to be "binding in all subsequent proceedings in the same case in the trial court or on a later appeal." *Transamerica Leasing, Inc. v. Inst. of London Underwriters*, 430 F.3d 1326, 1331 (11th Cir. 2005) (quoting *Heathcoat v. Potts*, 905 F.2d 367, 370 (11th Cir. 1990)).

The law-of-the-case doctrine follows from the mandate rule "which provides that subsequent courts are 'bound by any findings of fact or conclusions of law made by the court of appeals in a prior appeal of the same case.'" *Friedman v. Mkt. St. Mortg. Corp.*, 520 F.3d 1289, 1294 (11th Cir. 2008) quoting *Robinson v. Parrish*, 720 F.2d 1548, 1549–50 (11th Cir.1983). The law-of-the-case doctrine

and the mandate rule "appl[y] to all issues decided expressly or by necessary implication." *Piambino v. Bailey*, 757 F.2d 1112, 1120 (11th Cir.1985). "A trial court, upon receiving the mandate of an appellate court, may not alter, amend, or examine the mandate, or give any further relief or review, but must enter an order in strict compliance with the mandate." *Id.* at 1119. "A district court when acting under an appellate court's mandate, 'cannot vary it, or examine it for any other purpose than execution; or give any other or further relief; or review it, even for apparent error, upon a matter decided on appeal; or intermeddle with it, further than to settle so much as has been remanded.'" *Litman v. Massachusetts Mut. Life Ins. Co.*, 825 F.2d 1506, 1510–11 (11th Cir. 1987) quoting *In re Sanford Fork & Tool Co.,* 160 U.S. 247, 255 (1895).

On appeal, the Newman Appellants[6] argue that the law-of-the-case doctrine should not have been applied to this Court's determination that Compulife's Transformative Database constitutes a trade secret in the second trial because the second "trial produced additional evidence that was not before this Court in *Compulife I.*" (Newman Br. at 35). The additional evidence the Newman Appellants point to in the second trial is the evidence showing that while Compulife "required its software licensees to agree to licenses restricting their use

---

[6] The Newman Appellants and Newman Br. refer to the arguments made in the initial brief filed by David Rutstein, Moses Newman, and Aaron Levy.

of the software," that in the case of MSCC "Compulife did not require MSCC to sign a licensing agreement or pay for its use of its internet quote engine until May 2015 long after the allegations supporting misappropriation in the 08 Case."[7] (Newman Br. at 36-37). The Newman Appellants also point to "Mr. Rutstein…sending Compulife a misleading email" as evidence of "Compulife's negligence in handing over its alleged trade secrets." (Newman Br. at 37). The Newman Appellants also argue that in the 42 Case Compulife did not prove that the "insurance quotes potentially derived economic value from not being generally known," and the fact that insurance quotes were "freely accessible by the public" undermined the trade secret determination. (Newman Br. at 37-38).

None of the Newman Appellants' arguments are meritorious for several reasons. *First*, although the issue was not contested in the first appeal, this Court found that the Compulife's Transformative Database was in fact a trade secret and is precluded from revisiting this issue. *Compulife I,* 959 F.3d at 1311 ("The magistrate judge found that Compulife's Transformative Database was a trade secret, a finding that is not clearly erroneous and that, in any event doesn't seem to be contested on appeal."); s*ee e.g., Schiavo ex rel. Schindler,* 403 F.3d at 1291 (11th Cir. 2005) ("Law of the case binds not only the trial court but this court as

---

[7] In point of fact, the misappropriation in the 08 Case was discovered in April of 2015.

well."); *Alphamed, Inc.*, 367 F.3d at 1287 (holding law of the case doctrine precludes the Court from reconsidering the merits of the issues that were resolved in *Alphamed I*, where there was sufficient evidence supporting jury's identical verdict in both cases); *This That And The Other Gift And Tobacco, Inc. v. Cobb Cnty., Ga.*, 439 F.3d 1275, 1284 (11th Cir. 2006) (per curiam) (holding that lower court violated law-of-the-case doctrine on remand when it revisited the issue of whether Georgia's obscenity statute violated plaintiff's First Amendment rights, which this Court already decided-*at least by implication*-that statute could not be saved and violated First Amendment right to commercial speech).[8]

*Second*, the "additional evidence" the Newman Appellants point to from the second trial is not substantially different evidence than the evidence from the first trial. *See United States v. Robinson*, 690 F.2d 869, 872 (11th Cir. 1982) (law of the case doctrine does not apply "when (1) a subsequent trial produces substantially

---

[8] In *This That And The Other Gift And Tobacco, Inc.*, this Court cited to the following cases in support that the previous panel's conclusion deciding a previous issue implicitly: *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817, 108 S.Ct. 2166, 2178, 100 L.Ed.2d 811 (1988) ("That the Federal Circuit did not explicate its rationale is irrelevant, for the law of the case turns on whether a court previously decided upon a rule of law—which the Federal Circuit necessarily did—not on whether, or how well, it explained the decision.") (internal quotation marks and alteration omitted); *United States v. Jordan*, 429 F.3d 1032, 1035 (11th Cir. 2005) ("We did not address that argument in so many words, or in any words for that matter, but we did reject it 'by necessary implication,' which is enough under our decisions to bring the law of the case doctrine to bear in this appeal.") (citations omitted).

different evidence" from the first trial).

The Newman Appellants point to the district court's findings in the second trial concerning Michael Steinhardt, the owner of MSCC, who testified at deposition before the second trial that he signed a licensing agreement with Compulife for its internet quote engine in May of 2015 after the defendants' misappropriation was discovered. (Newman Br. at 7-8 citing 08 DE 314 at 13, ¶ 33). The Newman Appellants claim that Mr. Steinhardt's testimony is additional evidence requiring this Court to disregard its law-of-the-case determination that the Compulife Transformative Database was a trade secret.

The actual findings of the district court on this issue were as follows:

33. MSCC Corporation, owned by Michael Steinhardt, sold internet software to insurance agents and was an authorized re-seller of Compulife's software for approximately 20 years. See Steinhardt Dep. Tr. 7:3-5, 9:5-13 (PX 566). MSCC had Compulife's internet quote engine software installed on its website; before MSCC's customers could use Compulife's software on its website, MSCC verified that the customer was a subscriber of Compulife's PC service. (Id. at 9:16-10:25). Until May 2015, MSCC was not required to sign a licensing agreement with Compulife or pay it for its use of Compulife's internet quote engine. (Vol. 2, 46:10-23).

(42 DE 310 at 13).

The evidence in the first trial of Mr. Steinhardt's company MSCC's relationship with Compulife was based not on deposition testimony, but on an affidavit of Mr. Steinhardt introduced in the first trial over objection. (08 DE 193-21, PX 157). Mr. Steinhardt's testimony by deposition introduced in the second

trial included Mr. Steinhardt's admission that his affidavit introduced in the first trial was true and correct. (PX 566 at 1-26). Mr. Steinhardt's testimony introduced in the second trial also included Mr. Steinhardt's admission that his company, MSCC – which like Compulife is also in the software business – always treated Compulife's software when it was on MSCC's servers just like Mr. Steinhardt treated MSCC's own trade secrets. (PX 566 at 50-52). Mr. Steinhardt also testified that even though he did not sign Compulife's license agreement until May of 2015, he understood that MSCC was bound by a license permitting authorized use of the software by MSCC and its clients. (PX 566 at 30-31). Therefore, the fact that the license agreement was not signed until after MSCC was using Compulife's software did not matter; Mr. Steinhardt treated Compulife's software as a trade secret under license to MSCC regardless.

Furthermore, there was no evidence of "Compulife's negligence in handing over its alleged trade secrets" as the Newman Appellants claim. (Newman Br. at 37). To the contrary, Mr. Steinhardt testified that the use of the Transformative Database in Compulife's software was limited to authorized customers of Compulife. (PX 566 at 37). The district court did not find anything to indicate negligence by Compulife in handling its trade secrets either.

The Newman Appellants also make the mistake that this Court cautioned against in *Compulife I* of confusing insurance *"quotes" --* which are provided to

24

customers and are not contained in the Transformative Database -- with insurance "*rates,*" one of the "raw materials" used to create quotes. (08 DE 308, 45:25-46:1). The Newman Appellants claim that the district court should have reevaluated whether Compulife's trade secret "insurance quotes potentially derived economic value from not being generally known," since they were "freely accessible by the public." (Newman Br. at 37-38). However, the Transformative Database was not "freely accessible to the public." Moreover, the Transformative Database does not contain quotes, it contains *rates* that the Transformative Database uses to calculate the *premium* that is given in a quote to a consumer to tell them how much the insurance will cost. (08 DE 308, 46:3-5). There was no evidence in the second trial that the compilation of rates in the Compulife Transformative Database was generally known or freely accessible by the public, all the evidence was that the Transformative Database was proprietary to Compulife.

Robert Barney testified at great length in the second trial explaining that Compulife's database of insurance information in Compulife's software derived economic value from not being known to others, and was the subject of reasonable efforts to maintain its secrecy. Compulife kept its database confidential, encrypted it, secured it, encoded it, licensed it under restrictive terms and confidentiality, and limited access to it to maintain its secrecy. (08 DE 308, 45:10-20). Compulife wrote its software containing its database in C++ code and only provided licensees

with compiled versions of the software. (08 DE 309, 125:9-20). Compulife only permitted authorized users to access the Compulife data files. (08 DE 308, 51:3-8). The program used by Compulife for creating and maintaining its trade secrets was written in C++ compiled code and is not provided externally to anyone. (08 DE 309, 125:12-20). The Compulife trade secrets are intentionally encrypted in such a way as to ensure that the data files cannot be easily reverse engineered. (08 DE 308, 45:10-20, 51:13-16). The only permissible way to access the Compulife data files in order to obtain a quote is by using the compiled program which is licensed to Compulife customers or by visiting www.Term4sale.com. (08 DE 308, 50:15-20, 51:4-8).

Furthermore, all Compulife software is licensed to users pursuant to licensing agreements. (08 DE 308, 44:9-11, 49:14-16). Compulife's licensing agreements prohibit the user from duplicating, reverse compiling, reverse engineering, reformatting, or providing internet web quoting service to sub-users without Compulife's permission. (08 DE 309, 36:5-7; PX 537). That same agreement notifies the user that Compulife's software includes names of variables and lists of variables which are proprietary to Compulife. (PX 537). The data in Compulife's software is encrypted so that it is only usable by Compulife's licensed subscribers. (08 DE 310, 135:4-8). Compulife includes serial numbers in each version of its software that are cross referenced with Compulife's database of

licensed users, and Compulife automatically disables software that is not properly licensed.  (08 DE 309, 121:20-122:1-6). Compulife also includes watermarks in its software to detect unauthorized users. (08 DE 308, 140: 23-25).

Compulife's expert Nancy Miracle also testified that Compulife's watermarking system was an effective way for Compulife to identify whether the data being displayed on a website in insurance quotes is Compulife's data. (08 DE 311, 6:19-25). She also testified that watermarking of the licensing number is difficult to detect because the codes are small (just two letters) and "look like a data processing error of some sort." (08 DE 311, 6:19-7:16). Miracle opined that the watermark was implemented "fairly cleverly". (08 DE 311, 8:2-15). Miracle tested the watermark system and confirmed it worked as described by Compulife. (08 DE 311, 8:16-22).

Following the first trial, the district court determined that the Transformative Database was a trade secret because the "Transformative Database cannot be replicated using only the publicly-available rate tables as the distillation method and the calculation formula are not known to anyone other than Barney and Bruner." (08 DE 224 at 36). Following the second trial, the district court determined that "[b]ecause the data files could be reverse-engineered if not protected, Compulife designed an encryption system so that if someone outside the company looked at the data files 'it just looks like a bunch of garbage.'" (08 DE

314 at ¶ 14).

None of the factors upon which the determination whether Compulife possessed a trade secret in its Transformative Database changed between the first trial and the second trial. If anything, the facts became stronger. Therefore, there was no need to re-evaluate this Court's or the first district court's findings that the Transformative Database was a trade secret, and the district court's reliance upon the law-of-the-case doctrine was proper.

**B. The District Court Correctly Determined that the Defendants' Scraping Attack Amounted to the Acquisition of Compulife's Trade Secrets by Improper Means and Use**

This Court determined in *Compulife I* that the district court "left undecided the truly determinative questions: (1) whether the block of data that the defendants took was large enough to constitute appropriation of the Transformative Database itself, and (2) whether the means they employed were improper." *Id*. at 1315.

The Newman Appellants -- attacking the district court's finding in the second case that the defendants engaged in an improper scraping attack on Compulife's Term4Sale website using a software robot -- complain, at length, that web "scraping" is not "hacking." (Newman Br. at 38-44). Binyomin Rutstein[9] similarly argues that "scrapping" (sic) is not improper misappropriation of trade

---

[9] Appellant Binyomin and Binyomin Br. refer to the arguments made in the initial brief filed separately by Binyomin Rutstein.

secrets because the insurance quotes the defendants scraped from the Term4Sale website were publicly accessible and therefore they were not used or acquired without Compulife's permission. (Binyomin Br. at 20-28).

The defendants seem to have forgotten that this Court determined that data scraping is a type of actionable trade secret misappropriation used by hackers. *Compulife I*, 959 F.3d at 1299 ("Scraping is a technique for extracting large amounts of data from a website. The concept is simple; a hacker requests information from a server using ordinary HTTP commands similar to those that a legitimate client program of the server might employ in the ordinary course."). The defendants' briefs read like a belated attempt to reargue this Court's decision in *Compulife I* where this Court determined that the mere fact that Compulife's Term4Sale website offered individual quotes for free to the public did not eliminate the possibility that so many of those quotes could be acquired by non-manual automated processes as to amount to misappropriation.

Recall, this Court reversed the first district court's determination that "the Transformative Database could not have been misappropriated by acquisition in the 42 case because the individual quotes that Natal scraped were freely available to the public." *Compulife I*, 959 F.3d at 1314. This Court said, "That is incorrect." *Id*.

> Even granting that individual quotes themselves are not entitled to protection as trade secrets, the magistrate judge failed to consider the

important possibility that so much of the Transformative Database was taken—in a bit-by-bit fashion—that a protected portion of the trade secret was acquired. The magistrate judge was correct to conclude that the scraped quotes were not individually protectable trade secrets because each is readily available to the public—but that doesn't in and of itself resolve the question whether, in effect, the database as a whole was misappropriated. Even if quotes aren't trade secrets, taking enough of them must amount to misappropriation of the underlying secret at some point. Otherwise, there would be no substance to trade-secret protections for "compilations," which the law clearly provides.

*Id.*

The defendants' briefs seem more concerned with the semantics of the district court's decision (i.e. the use of the term "hacking" to describe the defendants' *modus operandi*) than they do with the district court's findings in the 42 Case that the defendants acquired the Transformative Database through "improper means." The district court's findings are unequivocal.

> Based on the circumstances here, including evidence in the record of David Rutstein's persistent efforts to sabotage Compulife by luring away its customers, I find that by using a robot to hack the Term4Sale website, Defendants intentionally sought to acquire Compulife's trade secrets through improper means. Defendants' subsequent use of the Term4Sale website in a way that was never intended, stealing a significant portion of Compulife's data, and knowingly incorporating that stolen data into its own websites also constitutes improper means. Thus, in the '42 case, Defendants are liable for misappropriation of Compulife's trade secrets through both acquisition and use and Compulife is entitled to judgment on Counts I and V.

(42 DE 310 at 40-41).

At least one Florida state appeals court agrees with this Court that scraping information is misappropriation. *See Mapei Corp. v. J.M. Field Mktg., Inc*, 295 So.

3d 1193, 1197 (Fla. 4th DCA 2020) (finding lower court erred in failing to extend injunction to former employee and competitor who scraped and gathered information from plaintiff's software system for their own benefit). Whether you call it scraping or hacking, the point is the same: to misappropriate information. *See e.g.*, *UAB "Planner5D" v. Facebook, Inc.*, No. 19-cv-03132-WHO, 2020 U.S. Dist. LEXIS 133542, at *23 (N.D. Cal. July 24, 2020) (denying motion to dismiss trade secret claim where plaintiff alleged data scraping technique through use of hacking software). That is precisely what Compulife proved.

Defendants' reliance on *Cvent, Inc. v. Eventbrite, Inc.*, 739 F. Supp. 2d 927, 932 (E.D. Va. 2010) is misplaced. *Cvent* concerned Computer Fraud and Abuse Act claims and the necessity of showing "technological access barriers" to prove unauthorized access under the CFAA. Compulife is not claiming CFAA violations here. Nor is Compulife claiming violations of Florida's Computer Abuse and Data Recovery Act, Fla. Stat. § 668.803, because those claims were dismissed. Compulife claimed trade secret misappropriation and the evidence of that misappropriation by the defendants' scraping attack using software robots amounted to improper means under both FUTSA and the DTSA. The defendants have failed to demonstrate that the district court's determination on this point was incorrect in any way.

**C. The District Court Correctly Determined that the Defendants' Scraping Attack Obtained Enough Data from Compulife's Transformative Database to Constitute Appropriation**

The Newman Defendants argue that the district court erred following the second trial when it held that "Defendants' subsequent use of the Term4Sale website in a way that was never intended, stealing a significant portion of Compulife's data, and knowingly incorporating that stolen data into its own websites also constitutes improper means." (42 DE 310 at 40-41). The district court's conclusion was based upon extensive testimony by defendant Moses Newman himself who admitted his role in the scraping attack.

> Defendant Moses Newman, who began programming for NAAIP.org in April 2016, testified that an Israeli woman named Matal performed the scaping attack. (Vol. 4, 109:19-110:6). While living in Tel-Aviv, Israel, Mr. Newman watched Matal use a computer to send automated requests in a way that was consistent with scraping. (Vol. 4, 110:3-6; Vol. 5, 67:22-68:3). The requests Matal sent were for two zip codes: 10458 in Bronx, New York, and 33433 in Boca Raton, Florida. (Vol. 4, 113:2-6). Matal took the information from the scraping attack and put it in a large CSV file, which Mr. Newman then integrated into the database that provided quote information to NAAIP.org websites. (Vol. 4, 110:7-18). Mr. Newman acknowledged the information in the CSV file came from Compulife's Term4Sale website. (Vol. 4, 114:5-9). Mr. Newman was paid for his work from a Paypal account that he thought belonged to Aaron Levy. (Vol. 4, 112:20-24; Vol. 5, 47:9-16). The CSV files were never produced to Compulife during discovery because they were routinely deleted. (Vol. 4, 110:19-21).

(42 DE 310 at 9).[10]

_____

[10] The district court dropped footnote 16 from this finding which read "Mr. Newman later confirmed that Matal had carried out the scraping attack on

The product of the scraping attack was "information…in a large CSV file, which Mr. Newman then integrated into the database that provided quote information to NAAIP.org websites." (08 DE 311, 110:7-18). The information was "for two zip codes, one in New York and the other in Florida." (08 DE 309, 160:8-21; 08 DE 311, 113:2-6). Compulife's expert "estimated that the scraping attack produced 43.5 million results." (08 DE 311, 9:12). The district court determined that "[t]he volume of Compulife's data that Defendants acquired during the scraping attack constituted such a significant compilation of information that '[d]erives independent economic value ... from ... not being readily ascertainable' as to warrant trade secret protection." (42 DE 310 at 39, quoting *Compulife I,* 959 F.3d at 1314-15.) Thus, the district court concluded that "[a]lthough the individual quotes themselves are not entitled to protection as trade secrets because they are publicly available, I find that so much of the Transformative Database was taken during the scraping attack that it amounted to a protected portion of Compulife's trade secret." (42 DE 310 at 39).

In *Compulife I*, this Court noted that "[e]ven if quotes aren't trade secrets, taking enough of them must amount to misappropriation of the underlying secret at some point. Otherwise, there would be no substance to trade-secret protections for

---

Compulife, testifying, "I wanted to know who scraped it and what was scraped. I believe Aaron Levy told me there is this girl, Matal, that did it." (Vol. 4, 115:6-9).

'compilations,' which the law clearly provides." *Id.* at 1315 (citing Fla. Stat. § 688.002(1), (4)). The Newman Defendants argue that the district court was either wrong to determine enough quotes were taken from Compulife, or wrong not to show the math it used to arrive at this conclusion. But the district court did show how it reached its conclusion: it relied upon the testimony of Mr. Newman and Ms. Miracle.

> Mr. Newman admitted "nobody ever wants to be scraped."
>
> but we all -- every single person here uses airline -- when we want to buy an airline ticket, we use sites like cheaperair.com or booking.com for hotels. None of those sites would exist without scraping. Some of them -- all of them have been sued. Now they all have agreements with the airlines, but they didn't at one point, and there are some very specific things laid out. I can't get into the legal aspects of it, but I don't remember volume being part of that.
>
> Clearly nobody wanted to be scraped, and nobody ever wants to be scraped.

(08 DE 311, 120:10-11). Mr. Newman claimed that the volume of quotes was roughly 3.5 million in the database he created from the quotes he was given by Matal. (08 DE 311; 117:16-118:8). That database was given to Ms. Miracle who analyzed it in preparation for providing her opinions. (08 DE 311, pp. 25-26). As noted above, Ms. Miracle "estimated that the scraping attack produced 43.5 million results." (08 DE 311, 9:8-16). She also opined that it could have produced as many as 80 million results depending upon how the scraping attack was performed. (08 DE 311, 25:9-15).

Whether the amount of information taken totaled 3.5 million quotes or 80

million quotes, the testimony and documentary evidence at the second trial was more than sufficient to demonstrate that "the block of data that the defendants took was large enough to constitute appropriation of the Transformative Database itself." Afterall, the defendants used their database to operate the insurance quoter at NAAIP.org. It was enough for defendants. There is simply no basis on which to disturb the district court's determination on this point.

### D. The District Court's Application of Joint and Several Liability for Trade Secret Misappropriation to All of the Defendants, including to Binyomin Rutstein, Should be Affirmed

The district court correctly applied joint and several liability to all the defendants for plaintiff's trade secret misappropriation claims. The district court's application of joint and several liability was based upon settled legal principles and should not be disturbed on appeal.

The first applicable principle is that trade secret misappropriation is considered to be an intentional tort.[11] The district court cited *Bovie Med. Corp. v. Livneh*, No. 8:10-CV-1527-T-24EAJ, 2010 WL 5297172, at *6 (M.D. Fla. Dec. 20, 2010) which relied upon *Vance v. Tire Eng'g and Distribution, LLC*, 32 So.3d 774, 776 (Fla. 2d DCA 2010) for this proposition. *See also Del Monte Fresh Produce Co. v. Dole Food Co.*, 148 F. Supp. 2d 1326, 1338 (S.D. Fla. 2001)

---

[11] Joint and several liability also applies to claims for copyright infringement. *See Bassett v. Mashantucket Pequot Tribe,* 204 F.3d 343, 360 (2d Cir. 2000); 3 Nimmer on Copyright § 14.04[E][2][d] (2004).

("Misappropriation of trade secrets is an intentional tort.").

The second principle is that the doctrine of comparative fault does not apply to intentional torts in Florida. *See* Fla. Stat. § 768.81(4) (Comparative fault "does not apply…to any action based upon an intentional tort."); *Barton Protective Servs., Inc. v. Faber*, 745 So.2d 968, 975 (Fla. 4th DCA 1999) (the statute makes an exception for actions based on an intentional tort).

The third principle is that joint and several liability is typically applied when defendants have acted in concert to commit a wrong that caused an injury, or where defendants, even without acting in concert, have committed separate wrongs that still produced an indivisible injury. *See Basel v. McFarland & Sons, Inc*., 815 So. 2d 687, 691 (Fla. 5th DCA 2002) (discussing history of Fla. Stat. § 768.81 and explaining that traditionally "joint and several liability applied when the defendants acted in concert, the act of one being considered the act of all, and each was therefore liable for the entire loss sustained by the plaintiff. The doctrine was later expanded by eliminating the requirement that the parties act in concert and allowing joint and several liability to apply when separate independent acts of negligence combined to produce a single injury."); *see also GE Betz, Inc. v. Conrad,* 231 N.C. App. 214, 235–36, 752 S.E.2d 634, 650 (2013) (approving of the application of joint and several liability to trade secret misappropriation tortfeasors who act in concert or act separately but cause a single injury).

Under the principle of joint and several liability, the victim of an intentional tort is entitled to sue any of the joint tortfeasors and recover his entire damages from that tortfeasor. *See Fabre v. Marin*, 623 So. 2d 1182, 1184 (Fla. 1993) (examining common law doctrine of joint and several liability); *Microsoft Corp. v. Cietdirect.com LLC*, No. 08-60668-CIV, 2008 WL 3162535, at *6 (S.D. Fla. Aug. 5, 2008) ("[s]ince joint tortfeasors are jointly and severally liable, the victim of [copyright] infringement may sue as many or as few of the alleged wrongdoers as he chooses; those left out of the lawsuit ... are not indispensable parties."); *Salton, Inc. v. Philips Domestic Appliances & Pers. Care B.V.*, 391 F.3d 871, 877 (7th Cir. 2004).

Applying these settled legal principles here leads to the conclusion that the district court's imposition of joint and several liability for trade secret misappropriation was entirely correct, non-controversial, and should be affirmed. Defendants acted in concert to commit the wrongs that caused Compulife injury. The district court's findings of fact support this amply. Defendant David Rutstein, without authorization, put the Compulife Internet Web Quoter on BeyondQuotes.com, sometime around August 2010. (42 DE 310 at ¶ 27). "In August 2011, David Rutstein used AWD [Binyomin Rutstein's company] to enter into an agreement with Brian McSweeney whereby for every lead Mr. McSweeney received that became a sale of an insurance policy, a 'lead generation fee' was paid

37

to AWD. Mr. McSweeney paid Defendants over $75,819.00 in exchange for sales leads that Defendants provided to Mr. McSweeney (generated from BeyondQuotes.com) while Compulife's software and data were used on the website." (42 DE 310 at ¶ 32).  Although David Rutstein was barred from the insurance industry in 2012, he opened AWD's bank account with Bank of America by presenting his passport with his photograph as identification and became an authorized signor on that account in July 2013. (42 DE 310 at ¶¶ 23, 30; PX 106). "By 2016, the ownership of the NAAIP.org website was transferred to Defendant Aaron Levy." (42 DE 310 at ¶ 24).  Defendant Moses Newman, a computer programmer who worked for NAAIP.org in April 2016, testified that at David Rutstein and Aaron Levy's direction, he watched an Israeli woman named Matal use a computer to send automated requests in a way that was consistent with scraping. (42 DE 310 at ¶ 51, n. 16). "Matal took the information from the scraping attack and put it in a large CSV file, which Mr. Newman then integrated into the database that provided quote

information to NAAIP.org websites." (42 DE 310 at ¶ 51). Each defendant played a role in furtherance of the misappropriation. Their liability was properly assessed jointly and severally.

The defendants' citation to *Fishkin v. Susquehanna Partners, G.P.*, No. 03-3766, 2007 U.S. Dist. LEXIS 19621, at \*9 (E.D. Pa. Mar. 19, 2007) and *Brocade*

*Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 873 F. Supp. 2d 1192, 1218 (N.D. Cal. 2012) are misplaced. Both those cases noted that, in general, liability for misappropriation claims is joint and several. These cases do not compel a different finding here where the defendants' actions all were in concert with each other.

Nor can Binyomin Rutstein escape liability for actual or enhanced damages based on post-trial claims that he lacked personal involvement. Binyomin Rutstein failed to appear at either trial of this case. He was absent at the first trial and at the second trial. Binyomin Rutstein made none of the arguments he is making here now at either trial even though he was represented by counsel. He therefore forfeited the arguments he is making now.

Binyomin Rutstein is also properly held responsible under Florida law as the owner, officer, and agent of AWD. Florida courts uniformly hold that if an officer, director, or agent commits or participates in a tort, whether or not his actions are by authority of the corporation or in furtherance of the corporate business, that individual will be liable to third persons injured by his actions, regardless of whether liability attaches to the corporation for the tort. *See First Fin. USA, Inc. v. Steinger*, 760 So.2d 996, 997–98 (Fla. 4th DCA 2000) (holding that president of corporation was not shielded from liability for fraudulent conduct); *Scutieri v. Miller*, 605 So.2d 972, 973 (Fla. 3d DCA 1992) (holding that corporate officers could be liable for defamation even though claim against corporation had been

39

settled).

The record supports the district court's findings that Binyomin personally participated in the misappropriation. The court found "Binyomin Rutstein … is purportedly NAAIP's president, but according to his father [David Rutstein], Binyomin never had any involvement in the company. (08 DE 314 ¶ 24). It further found "David Rutstein also founded BeyondQuotes. In 2008, the domain registration for BeyondQuotes.com was in Binyomin Rutstein's name, but it was later owned by David Rutstein." (08 DE 314 ¶ 26). Binyomin owned American Web Designers, Ltd. (AWD) and it is licensed as an insurance agency. (08 DE 314 ¶ 26). "Binyomin gave permission for David to use Binyomin's insurance license." (08 DE 314 ¶ 30). The district court concluded:

> Here, the evidence established that all four Defendants were involved in either directly acquiring Compulife's trade secrets or in using these trade secrets for economic gain and/or to the detriment of Compulife. David Rutstein was heavily involved in acquiring Compulife's Transformative Database through misrepresentation and deceit.  Mr. Levy and Mr. Moses were directly involved in the scraping attack. And Binyomin Rutstein owned AWD, a licensed insurance agency, which he allowed his father to use to collect fees from insurance sales leads generated by Compulife's stolen Transformative Database. Binyomin allowed his father to use his insurance license and name to establish insurance-related businesses in violation of the consent decree barring him from the insurance industry.  Each Defendant played a critical role in the enterprise to misappropriate Compulife's trade secrets, and therefore, joint and several liability is appropriate.

(08 DE 314 at 42).

**E. Compulife Proved Copyright Infringement and the District Court's Contrary Determination Should be Reversed on Compulife's Cross Appeal**

Compulife claimed that the Compulife 2010 HTML Code, and the organization and arrangement of that code, was its copyrightable authorship. (08 DE 307 at 39-40; 42 DE 309 at 39-40). The district court examined the individual building blocks of the code and determined that each was unoriginal. However, the district court failed to examine whether the organization and arrangement of those building blocks was original, creative authorship entitled to protection. The organization and arrangement was held to be protectible by copyright as a factual compilation in *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340 1(1991).

> Factual compilations...may possess the requisite originality. The compilation author typically chooses which facts to include, in what order to place them, and how to arrange the collected data so that they may be used effectively by readers. These choices as to selection and arrangement, so long as they are made independently by the compiler and entail a minimal degree of creativity, are sufficiently original that Congress may protect such compilations through the copyright laws. Thus, even a directory that contains absolutely no protectible written expression, only facts, meets the constitutional minimum for copyright protection if it features an original selection or arrangement.

(42 DE 310 at 14 quoting *Feist*, 499 U.S. at 347–48 (quotations and citations omitted).

Review of the district court decision reveals that the court below considered the different blocks of Compulife's HTML code separately, but never considered

whether the organization or arrangement of those code blocks met the very low threshold required to demonstrate originality and creativity. To understand where the district court erred, its verbatim findings of fact concerning the Compulife HTML Code are the appropriate starting point.

Let's start with the *function* the district court determined the code performs, which is to "gather[] information from the end user such as age, sex, smoking status, and then...call[] the Compulife internet engine which calculates an insurance quote and produces the results back to the user." (42 DE 310 at 4 citing Vol. 2, 120:18-19, 121:9-17). "Compulife's HTML code creates the web page a website visitor sees when they use the life insurance quote engine function. (Vol. 2, 64:20-65:5). Function is obviously unprotectible by copyright law, *see* 17 U.S.C. § 102, and Compulife never claimed infringement by code function.

Compulife claimed that the entire HTML code, and each block within the code, was its original creative authorship. So let's look at the different sections of code from a higher level, i.e. the

> different blocks of code: each block of code relates to the different information needed from a user to produce an insurance quote: state selection code (Vol. 2, 139:10-20); birthdate and birth month selection code (Vol. 2, 139:21-140:6); birth year code written in camel case (Vol. 2, 140:7-9); gender selection code (Vol. 2, 140:11-17); smoker/tobacco code (Vol. 2, 140:18-21); health class code (Vol. 2, 140:22-141:7); insurance category code (Vol. 2, 141:8-23); mode used code (Vol. 2, 142:2-5, 154:9-14); the code for sorting output information (Vol. 2, 154:24-155:11); and face amount code (Vol. 2, 142:19-143:4).

(42 DE 310 at 7-8). The district court explained this code in more detail in footnotes 8 through 13 of its decision. The district court noted that Compulife's programmer Bruner did not write the state selection code originally, but rather "inherited the code from a program that already existed in the Compulife source code library. (Vol. 2, 147:6-11, 182:13-183:4)." (42 DE 310 at 7 fn. 8). The district court determined that the use of "camel case" was unoriginal in the birth date and birth month selection code because it was "commonly used in computer programming." (42 DE 310 at 7 fn. 9). The district court referred to the gender selection code's "only" choice between male and female suggesting it was unoriginal. (42 DE 310 at 7 fn. 10). The district court referred to Bruner's admission that the use of a radio button for the choice of smoker or nonsmoker in the smoker/tobacco code was common, indicating the court believed this was unoriginal. (42 DE 310 at 8 fn. 11). The district court referred to the health class code as defined by "different insurance classifications: PP for preferred plus, P for preferred, RP for regular plus, and R for regular." (42 DE 310 at 8 fn. 12). Finally, the district court explained that the "mode used" code gives the annual premium as well as the "modal" premium, meaning "monthly, quarterly, or semiannually." (42 DE 310 at 8 fn. 13).

The district court continued by noting that "[i]n order for the Compulife HTML code to communicate with the Compulife internet engine, the HTML code

43

must send the engine the correct parameters and variables defined in the HTML code; it must be a one-to-one match." (42 DE 310 at 8 citing Vol. 3, 27:24-29:3; SUF ¶ 14). Importantly, the organization and arrangement of those "parameters and variables" are critical and must be sent to the Compulife internet engine in the way the parameters and variables are "written in the Compulife HTML" because "if it does not come to the engine in that way the software will spit out an error message and not produce results." (42 DE 310 at 8 citing Vol. 2, 121:18-122:3).

> The parameters [and their order] are: "State", "BirthMonth", "Birthday", "BirthYear", "Sex", "Smoker", "Health", "NewCategory", "ModeUsed", "SortOverride1", and "FaceAmount." (Vol. 2, 146:4-8, PX 542, 567). All the parameters must be present, spelled correctly and provided in the correct order for the software to produce quotes. (Vol. 2, 121:18-22).

(42 DE 310 at 8).[12]

The district court's analysis reflects its confusion about what it was supposed to consider, and what it was supposed to filter out and not consider, when it engaged in its analysis of the copyrightability of Compulife's HTML code.

First, Compulife's closed menu of limited options from which the end

---

[12] The district court noted that Compulife's Barney "acknowledged that these variables and parameters are based on standard insurance industry requirements. (Vol. 2, 27:6-16, 28:7-11, 18-25)." (42 DE 310 at 4). However, Barney never testified that the organization and arrangement of those variables and parameters in Compulife's code was unoriginal or uncreative. Furthermore, the defendants offered no evidence to show that the organization or arrangement of the variables and parameters in Compulife's code was unoriginal or creative.

> user must select to enable Compulife's program to produce a life insurance quote falls within the merger doctrine. As set forth above, when the expression is so intrinsic to the communication of a procedure or process, courts will find that the two have merged. This typically occurs when there are only a limited number of ways to present an idea. Here, as Mr. Barney conceded, it is an insurance industry standard to ascertain an applicant's age, gender, health, and location in preparing a life insurance quote. It is indisputable that there are only few methods by which Compulife can gather and compile the information needed to generate a life insurance quote. Thus, Compulife's use of a radio button, as opposed to a drop-down menu, to identify the applicant's gender does not constitute an original expression.

(42 DE 310 at 30). Compulife never claimed that its "closed menu of limited options" was copyrightable. Compulife never claimed that the use of "an applicant's age, gender, health, and location in preparing a life insurance quote" was copyrightable either. Nor did Compulife claim that its use of a radio button was copyrightable. The district court questioned Compulife's assertion that "all of its code is protectable," (42 DE 310 at 28) and noted that in light of this Court's decision in *Compulife I* the organization and arrangement of some of Compulife's HTML code blocks, such as the alphabetization of the state selection code, "should be filtered out and excluded when analyzing the similarities between the works." *Compulife I*, 959 F.3d at 1307. But, to put a finer point on it, Compulife asserted that the organization and arrangement of all of Compulife's code was protectible. (08 DE 307 at 39-40; 42 DE 309 at 39-40). However, the district court never addressed this claim.

The district court's failure to consider the organization and arrangement of the blocks of Compulife's HTML code defies explanation. The district court recognized that factual compilations are entitled to protection, but appears to have been confused about what Compulife was trying to protect. For example, the district court said that it was "mindful that factual compilations, like the ones *performed* by Compulife's software in *compiling facts* about the consumer's biographical information and the rates used by insurance companies to generate a quote, must involve some creativity (in terms of the facts Compulife chose to include and how to arrange the collected data) to be protectable." (08 DE 314 at 29). Compulife never sought to protect the compilation of facts *performed* by the HTML Code when it produced a quote, nor did Compulife seek to protect the process the HTML code used to compile the facts to obtain the quote or produce the quote. Rather, Compulife sought to protect the organization and arrangement of the code itself, including the parameters and variables contained in that code.

### 1.     Chris Bruner, Nancy Miracle and Robert Barney Testified that the Organization and Arrangement of the Compulife HTML was Original and Creative, and Defendants Offered no Contrary Evidence.

The defendants offered arguments, not evidence, in support of their burden. The defendants never identified what lines of the HTML source code they claimed were unoriginal. The district court appears to have credited the defendants' arguments without any evidence to support it. The district court's decision recounts

the defendants' arguments against copyrightability on page 27 to 28 of its decision, citing to the defendants' proposed findings of fact and conclusions of law. (42 DE 310 at 27-28 citing to 08 DE 306 at 19-20). The defendants' proposed findings cite in their facts to the testimony of witnesses Barney, Bruner and Miracle. However, at no point did these witnesses testify that the organization and arrangement of the blocks of code within Compulife's HTML was dictated by industry standards or found in the public domain.

To the contrary, Barney was asked whether he directed Bruner to organize the HTML for the quote engine in any particular way. Barney responded, "[t]here wasn't a need for that." (08 DE 309, 29:10). Bruner testified he created the variables in the HTML source code himself and did not copy from anyone else. (08 DE 310 at 22:15-24). While Bruner did take "existing source code that was at Compulife already," these were "standard library functions" that were a minor part of the HTML. (08 DE 309, at 183:3-17).

Bruner never testified that the organization or arrangement of the HTML code blocks was anything other than original to him, and defendants offered no evidence on this point. Miracle testified that from her review of the code it contained numerous creative elements including a creative way to identify and

*organize* variables related to requests for insurance quotation information.[13]

Miracle testified:

> The part that is discretionary, and the part where the programmer's creativity shows -- don't laugh at me, programmers are creative -- is the part where Chris Bruner went ahead and described what he wrote, how he wrote it, why he picked those names, and the fact that those names are not only required here, the names are required in the C++ code to which this html is the front end, and to which this html prepares input to be able to invoke it correctly.
>
> Those are unique and, you know, I look at so much html, and there are things that are always the same, the head tags are always the same, the body tages, etc., but the place that the creativity shows is in the choices like names, structures, and stuff, and those are the things that were copied.

(08 DE 310, 146:9-24).

Miracle's expert report explained the protectible portions of Compulife's HTML by reference to the "copyright for the HTML source code of 2010 [which] specifies the parameters that are used to format a requires for information from the Compulife database. (PX 173 at 15-17). Each parameter has a distinct name and distinct values associated with that distinct name. (PX 173 at 15-17). Miracle explained "[t]he combination of the names of all the parameters is unique, as are the data values. The names are purely arbitrary and not dictated by any external factor." (PX 173, at 15-17).

Compulife proved that the parameters and code blocks in the 2010 HTML

---

[13] The district court correctly disregarded Nancy Miracle's legal conclusions. (08 DE 314 at 28).

Code were formatted and ordered in a specific way that was original to Compulife. The 2016 scraping attack succeeded because the parameters were copied exactly as they are organized in the Compulife HTML Source Code: "State", "BirthMonth", "BirthYear", "Sex", "Smoker", "Health", "NewCategory", "ModeUsed", "SortOverride1" and "FaceAmount." The Defendants would not have been able to steal millions of quotes in the scraping attack without formatting and ordering the parameters in this **exact order**.

Instead of considering the overall arrangement of the parameters and variables in the compilation of code, the district court instead critiqued the originality of each. (08 DE 314 at 31). The district court found that "FaceAmount" parameter that identified the amount of life insurance policy sought was unoriginal. *Id.* The court's conclusion that "the traditional numeric sequencing of birth months, dates and years is logical, most efficient, and that they could not reasonably be presented in an alternative manner" focuses on the values of these parameters, not the way that the parameters are arranged or organized. (08 DE 314 at 31).

Moreover, the district court gave no weight to Bruner's testimony that he could have called the birth year parameter anything he wanted when he was programming the code, and chose "BirthYear", giving rise to even the most minimal level of creative or original expression. *Feist*, 499 U.S. at 345 ("original,

49

as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity."). The district court ignored that the "FaceAmount" parameters (and others) were written in camel case, distinguishing itself from this WinQuote parameters.

The fact that a prior style of "camel case" computer programming exists does not automatically render the expression unprotectible. The way in which Bruner chose to use camel case in defining the parameters in this life insurance HTML source code is creative and original expression and meets the minimal bar. The original parameters and variables in Compulife's HTML were made up by Bruner himself and selected for inclusion in the Compulife HTML. (08 DE 309, pp. 139-154). The original parameters and variables are accompanied by line after line of computer code originally written by Bruner. (08 DE 309, 128:13-17; 08 DE 310, 22:17). The code lists acceptable data values corresponding to his chosen parameters and variables. (08 DE 310, 128:1-4). The many lines of original HTML computer code containing the data values and corresponding parameters and variables are organized and arranged in a way that the Compulife Internet Engine software expects to see them to successfully respond to requests for insurance quotes. (08 DE 309, 121:18-25). Without Compulife's arrangement, the end user gets no information. (08 DE 309, 122:1-3). Bruner's selection and arrangement of

the lines of computer code, variables and parameters easily met copyright law's low threshold for protectible expression.

The district court also incorrectly gave considerable weight to the Defendants' argument that the use of a radio button, as opposed to a drop-down menu to the end user to identify gender falls within the merger doctrine, rendering it unoriginal. Chris Bruner testified that there were other ways the code could have been written, including the choice of a drop-down menu. (08 DE 309, 150:4-7). Those were not the only two limited choices and the Defendants provided zero evidence to support its contention. The district court erred as a matter of law when it applied the merger doctrine to the use of radio buttons to display gender selection. "The merger doctrine provides that 'expression is not protected in those instances where there is only one or so few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself.'" *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129, 1142 (11th Cir. 2007) (citation omitted).

In *BUC Int'l Corp.*, plaintiff claimed copyright protection of the factual compilation of its BUCNET Service database of yacht listings. The defendant created an online MLS for yacht listings that copied 2700 of plaintiff's BUCNET listings. *Id.* at 1136-1137. Defendant argued that plaintiff's selection of section headings does not survive application of the merger doctrine because there are so

51

few ways of effectively describing a boat, plaintiff has expressed the idea of organizing a vessel listing by using standard industry terms (i.e., rooms, mechanical equipment), such that the expression has merged with the idea. *Id.* at 1143. This Court was not convinced that merger occurred, noting that defendant attempts to cast the idea and the expression as one, which "would swallow up the idea-expression dichotomy, and the merger doctrine would become the rule instead of the exception." *Id.* at 1144. The Court reasoned that based on the evidence submitted, there were a number of potential expressive options indicating that plaintiff's selection of section headings did not merge with the larger idea of describing a yacht. *Id.* at 1144. The Court logically reasoned that "[i]n that same vein, [defendant] is not foreclosed from using industry terms like "galley" or "hull;" it simply cannot use them in the same manner in which [plaintiff] did." *Id.*

Here, the district court did not even identify the "idea" and the "expression" of the parameters were before applying merger. The court stated that because "there are only a few methods by which Compulife can gather and compile the information needed to generate a life insurance quote" it somehow jumped to the conclusion that "[t]hus, Compulife's use of a radio button, as opposed to a drop-down menu, to identify applicant's gender does not constitute an original expression. (08 DE 314 at 30). There were no findings of facts and conclusions of law to support this holding. The merger doctrine was barely discussed. It is

52

illogical for the court to reason that merger applied to the use of a radio button

when there were other ways to display this information, including a drop-down

menu to choose gender in searching for a life insurance quote. Applying the same

reasoning in *BUC Int'l Corp.,* Defendants here are not foreclosed from using

gender to collect information for life insurance quotes, it just could not use the

gender variable through the use of a radio button. 489 F.3d at 1144; *see also*,

*Thornton v. J Jargon Co.*, 580 F. Supp. 2d 1261, 1273 (M.D. Fla. 2008) (finding

merger doctrine does not apply to copyrightable trivia game about baby boomers

because "Plaintiff expressed this idea using one approach: selecting twenty-nine

subjects to test and phrasing and arranging the questions in a unique manner.").

Likewise, Defendants could have used a drop down menu, or check box, or a

manual input text field. But they did not and instead copied almost all of the source

code verbatim. For this reason, the district court must be reversed.

### 2. Compulife Proved Both the Qualitative and Quantitative Significance of Defendants' Copying of 2010 HTML Source Code

After the district court erred in its filtration analysis of the 2010 HTML

Source Code, it erred in its assessment of substantial similarity between the source

code and the copied work. Substantial similarity "must be assessed with respect to

both the quantitative and the qualitative significance of the amount copied to the

copyrighted work as a whole." *Peter Letterese And Assocs., Inc. v. World Inst. Of*

*Scientology Enterprises,* 533 F.3d 1287, 1307 (11th Cir. 2008). "Quantitatively

insubstantial copying may still be actionable if it is qualitatively substantial."

*Compulife I*, 959 F.3d at 1302 citing *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 565 (1985).

The Compulife 2010 HTML code totals 347 lines. (08 DE 310, 147:4). Thirteen of those lines are mandatory and have to be in the code for it to function. (08 DE 311, 4:15-5:5). Of the remaining code, Defendants copied 282 lines of Compulife's HTML code, or 84% of the total lines of code. (08 DE 310, 144:7-146:22). The district court found that "at most, the protectable portions of Compulife's code that Defendants copied are limited to 27 lines, namely 507, 508, 761, 764-788." The court made no explanation as to which lines of the source code warranted filtering. Furthermore, there was no basis for filtering out any of the source code based on the lack of evidence described above. The district court's decision did not consider the evidence that the source code had original protectible portions of the whole source code based on the organization and arrangement of its variables and parameters.

The district court overlooked Nancy Miracle's expert testimony. At the second trial, Ms. Miracle initially testified that the defendants copied 81% of the code based on defendants' copying of 282 lines out of 347 lines total. (08 DE 310, 146:22). The court then asked Ms. Miracle to recalculate the percentage used after determining the non-discretionary portion of the total lines of HTML. (08 DE 310,

146:25-147:21). Thereafter, Ms. Miracle determined that thirteen lines of HTML code were non-discretionary. (08 DE 311, 4:15-5:5). While Ms. Miracle did not report the new percentage, the calculation based on 334 total non-discretionary lines to 282 lines copied yields 84%. The fact that Defendants copied 84% of those lines establishes a quantitatively significant amount of code copied.[14] *Compulife I,* 959 F.3d at 1310 ("[e]ven a cursory comparison . . . suggests that the defendants' work copied material from nearly every page of the copyrighted work. The defendants' code includes nine of the eleven basic sections of Compulife's code, arranged in almost exactly the same order.").

The district court further erred by finding that Compulife failed to establish quantitative significance in the protectible portions of the 2010 HTML Source Code. Those lines of code were to perform the key functions needed to produce an insurance quote from user input: the state selection code, the birthdate and birth month selection code, the birth year code written in camel case, the gender selection code, the smoker/tobacco code, the health class code, the insurance category code, the mode used code, the code for sorting output information, and the face amount code. The district court's conclusion that "the need for the formatting to be 'exact' does not transform the code into something protectable"

---

[14] Compulife believes that the Court should have compared the 247 lines to what the NAAIP used, as explained in the Court's analysis at (08 DE 314 at 32).

misses the point of why quantitatively insubstantial copying may still be actionable if it is qualitatively substantial. "For instance, because 'a small portion of the structure or code of a [computer] program may nonetheless give it distinctive features or may make the program especially creative or desirable,' copying of that portion is actionable." *Compulife I*, 959 F.3d at 1302 (citing 4 Nimmer on Copyright § 13.03[F][5] (2019)). Defendants copied a significant portion of the source code because of its desirable features of accessing the Transformative Database. Compulife demonstrated both qualitative and quantitative significance, establishing substantial similarity between the HTML Source Code, and the Defendants' code on its NAAIP website.

## VII. CONCLUSION

The judgment in favor of Compulife on its trade secret misappropriation claims in the 08 and 42 cases should be affirmed. The judgment in favor of Defendants on Compulife's copyright infringement claims in the 08 and 42 cases should be reversed and the district court should be directed to enter judgment in favor of Compulife.

Dated: October 17, 2022

<div style="margin-left:40%">

Respectfully submitted,

*/s/ Joel B. Rothman*
JOEL B. ROTHMAN
joel.rothman@sriplaw.com
LAYLA T. NGUYEN
layla.nguyen@sriplaw.com

</div>

*Attorneys for Cross-Appellant and*
*Appellee Compulife Software, Inc.*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.　　　This document complies with the type-volume limit of Fed. R. App. P. 28.1(e)(2)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

**[X]**　　　this document contains 13,715 words, **or**

**[ ]**　　　this brief uses a monospaced typeface and contains [*state the number of*] lines of text.

2.　　　This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

**[X]**　　　this document has been prepared in a proportionally spaced typeface using Microsoft Word in size 14 font in Times New Roman type font, **or**

**[ ]**　　　this document has been prepared in a monospaced typeface using [*state name and version of word-processing program*] with [*state number of characters per inch and name of type style*].

*/s/ Joel B. Rothman*　　　　　　　　　
Joel B. Rothman

58

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 17, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive notices of filing electronically.

By: */s/ Joel B. Rothman*
    Joel B. Rothman